**UNITED STATES of America,**
**Appellee,**

v.

**Philip A. GIORDANO, Defendant–**
**Appellant.**

**Docket No. 03–1394.**

United States Court of Appeals,
Second Circuit.

Argued: Oct. 20, 2004.

Decided: March 3, 2006.

---

Andrew B. Bowman, Westport, CT, for the appellant.

Peter S. Jongbloed, John A. Marrella, Assistant United States Attorneys (John H. Duram, Deputy United States Attorney, District of Connecticut, William J. Nardini, Assistant United States Attorney, on the brief), New Haven, CT, for the appellee.

Before: JACOBS, SOTOMAYOR, and HALL, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Defendant-appellant Philip A. Giordano appeals from a June 13, 2003 judgment of conviction and sentence entered after a jury trial before the United States District Court for the District of Connecticut (Nevas, J.). Giordano, formerly the mayor of Waterbury, Connecticut, was convicted of two counts of civil rights violations under color of law in violation of 18 U.S.C. § 242, one count of conspiracy to use a facility of interstate commerce for the purpose of enticing a person under the age of sixteen years to engage in sexual activity in violation of 18 U.S.C. §§ 371 and 2425, and fourteen substantive counts of such use of a facility of interstate commerce in violation of § 2425. All of the convictions stem from Giordano's repeated sexual abuse of the minor daughter and niece of a prostitute. Giordano raises a host of challenges to his convictions and sentence, the majority of which are addressed in a separate summary order also filed today. We write separately to address Giordano's claims that (1) § 2425 does not reach intrastate use of a telephone for the unlawful purposes specified in the statute and that the application of the statute to such activity exceeds Congress's power under the Commerce Clause, U.S. Const. art. 1 § 8, cl. 3; (2) the evidence was insufficient to support his convictions under 18 U.S.C. § 242; and (3) the district court abused its discretion in failing to recuse itself from ruling on the admissibility of wiretap evidence because it had earlier approved the wiretap under 18 U.S.C. § 2518. Because these challenges and the arguments addressed in the summary order lack merit, we affirm the judgment of conviction.

## BACKGROUND

*1. Giordano's investigation and arrest*

Giordano's prosecution on the charges that led to this appeal grew out of an unrelated investigation by the FBI and IRS into political corruption in the city of Waterbury. Giordano, then mayor of Waterbury, was a target of this investigation. On February 18, 2001, the government obtained from United States District Judge Alan H. Nevas of the District of Connecticut an *ex parte* order authorizing it to intercept phone communications of Giordano and other targets of the investigation pursuant to the federal wiretap statute commonly known as "Title III," 18 U.S.C. §§ 2510–2520. Between February and July of 2001, the government continued to monitor calls made to and from Giordano's city-issued cell phones, among others, renewing its Title III application every thirty days and submitting periodic progress reports to the district court. Judge Nevas approved the renewal applications in each instance (a total of seven times).

In the course of this surveillance, the government intercepted 151 calls on Giordano's cell phones to or from Guitana Jones, a prostitute with whom Giordano had a long-term sex-for-money relationship. On July 12, 2001, the government reviewed the contents of a brief July 9 call between Jones and Giordano that suggested that Jones was bringing a nine-year-old girl to Giordano for sex. In another, equally brief July 12 call, Giordano asked if Jones would have with her the nine-year-old or another female whose age was not discussed. The government had an undercover police officer call Giordano's cell phone on the afternoon of July 12 and leave an anonymous message telling him, in threatening and profane but vague terms, that the caller knew about the little kids and would tell the media if Giordano did not desist. On July 13, the government intercepted a call between Giordano and Jones in which Giordano told Jones about the message and discussed who

might have left it. Giordano asked if the father of the second individual was alive, to which Jones replied: "No, [she] don't say nothin' .... [T]hey, them kids haven't said anything. They do not say nothing." Giordano answered, "Well someone said something to someone because this dude knew." Later in the same conversation, Jones said: "Nobody knows about them. Nobody. Nobody knows about them at all 'cause they don't even say nothing 'cause I got them to the point where they're scared, if they say somethin' they're gonna get in trouble. They don't say anything."

The government advised the district court, in filings on July 13 and 18, that it believed that Jones might be procuring for Giordano the sexual services of Jones' daughter and another minor female relative. On July 20, 2001, the government filed a criminal complaint against Jones charging her with violations of 18 U.S.C. §§ 371 and 2425 and obtained a warrant for her arrest. In the early hours of July 21, 2001, state authorities removed Jones' nine-year-old daughter (whom we refer to as "V1") and her eleven-year-old niece ("V2"), from the Jones household. The FBI intercepted a call soon after in which Jones advised Giordano that state authorities had removed the girls. Jones falsely told Giordano that a driver who had taken Jones, V1 and V2 to see Giordano was demanding $200 not to tell the authorities. Giordano placed this sum in an envelope in the mailbox outside his house. The FBI arrested Jones shortly after she retrieved the money.

At the behest of the FBI, Jones then called Giordano and falsely told him the driver was demanding additional payment. Giordano and Jones agreed to meet in a commuter parking lot on July 23, where Giordano would give her $500. On that date, after Giordano had given Jones money at the parking lot, agents approached

him and informed him that they had evidence of his sexual misconduct and other corrupt activities not relevant to the instant appeal. Over the next seventy-two hours, Giordano cooperated with the agents in the ongoing investigation of other targets of the original corruption investigation. On July 26, Giordano was arrested.

### 2. Indictment and relevant pre-trial proceedings

A federal grand jury returned a fourteen-count indictment against Giordano on September 12, 2001. That indictment charged Giordano with two counts of violating the civil rights of V1 and V2 under color of law, in violation of 18 U.S.C. § 242; one count of conspiring with Jones to transmit knowingly the names of V1 and V2 by using facilities and means of interstate commerce (to wit, telephones), with intent to entice, encourage, offer and solicit criminal sexual activity, in violation of 18 U.S.C. §§ 371 and 2425; and eleven counts of substantive violations of § 2425, each alleging a particular transmission via telephone of the name of V1 and/or V2 with intent to entice, encourage, offer and solicit illegal sexual activity. Before trial, Giordano moved to dismiss the indictment on various grounds, including two of the grounds he raises here. The district court rejected his motion in a published decision, *United States v. Giordano*, 260 F.Supp.2d 477 (D.Conn.2002) ("*Giordano I*"). Giordano also moved Judge Nevas, to whom the case was assigned, to disqualify himself from ruling on a pending motion to dismiss the wiretap evidence on the ground that Judge Nevas had earlier granted the Title III orders, the validity of which Giordano now challenged. Judge Nevas denied this motion for recusal. Giordano then sought a writ of mandamus in this Court seeking to overturn Judge Nevas' denial of the recusal motion; his petition was denied by

unpublished order of this Court on December 18, 2002.[1] *See In re Giordano*, No. 02–3095 (2d Cir. June 3, 2002) (*"Giordano III"*).

On January 16, 2003, the grand jury returned a superseding indictment ("the indictment") adding four additional counts of substantive violations of § 2425, each count alleging another specified phone call in which the names of V1 and/or V2 were transmitted for purposes of sexual abuse.

### 3. The trial

Giordano was tried before a jury from March 12 to March 24, 2003. In all, some fifty-three witnesses testified. The heart of the government's case was the testimony of Jones, V1 and V2, and the intercepted phone calls. Jones testified that she met Giordano well before his 1995 election to the mayor's office, when Giordano was a lawyer in private practice. From the time she first met him until the time of her arrest in 2001, she frequently had sex with Giordano in exchange for money, which she used to support her addiction to crack cocaine. She met him as often as two or three times a week, usually at his law office, and sometimes arranged for other women to come with her. Jones testified that in the summer of 2000, while he was mayor of Waterbury, Giordano asked her to bring "young girls" to perform sexual services. In response to this request, Jones brought several girls between the ages of fourteen and sixteen, including a niece, to perform oral sex on Giordano.

Jones testified that in November of 2000, on an occasion when Jones had brought her daughter V1, her niece V2, a nephew and a son with her to Giordano's law office, Giordano asked her elliptically "What about [V1]?", which Jones understood as a request that V1, then eight years old, perform oral sex on him. Jones testified that she said no, but at a subsequent visit a few days later she brought V1 and instructed her to touch Giordano's penis until he ejaculated; while this happened, V2 and other children in Jones' care were in the law office waiting area, separated by a closed door. Several days thereafter, Jones brought both V1 and V2, who was then ten years old, to the office, where Jones performed oral sex on Giordano in the girls' presence. During the next visit, V1 performed oral sex on Giordano. At the conclusion of this episode, Jones testified, Giordano warned her, "Make sure she don't say nothing to no-one." Jones was paid for all of these activities.

Jones claimed that similar episodes of oral sex for money began to occur with regularity, usually at Giordano's law office but occasionally at Jones' or Giordano's home or an apartment belonging to a friend of Giordano's. In almost every case, the appointments were arranged by telephone. On a school holiday in the winter of 2000–2001, the date of which Jones could not recall, she brought V1 and V2 to the mayor's office at City Hall, entering through the back door. On that occasion, she directed both V1 and V2 to perform oral sex on Giordano. Jones testified that Giordano told her in a "calm voice" at the conclusion of this visit to "make sure the kids don't tell anyone [or] I'll get in trouble, I'll go to jail. . . . So I made sure they never said anything to anybody." He also told the girls directly that they would "get in trouble" and that Jones would go to jail if they told anyone

---

1. The mandamus petition also sought review of Giordano's later, broader motion seeking Judge Nevas' disqualification from all aspects of the case. We address Giordano's challenge to the denial of this second recusal motion in the separate summary order filed today.

about the abuse.[2] Jones maintained that it was Giordano's consistent practice to warn her and the girls to remain silent:

Q. And did he repeat that [warning] at any other time?

A. Yeah, every time after it happened. And I made sure the girls never said anything because I was scared. I didn't want to go to jail.

According to Jones, the abuse occurred at City Hall two or three more times. In addition, on two or three other occasions, when the law office was occupied by other people, Jones, Giordano and V1 used Giordano's official city car for V1 to perform oral sex.

V1 and V2 testified at trial via closed-circuit television from another room in which the government attorney and defense counsel were present. Their testimony substantially corroborated Jones' as to the nature of the acts they performed, the places they performed the acts, and the warnings they received in each instance from Jones and Giordano.

The victims also testified that they were hurt by and disliked the abuse but did not tell anyone about it out of fear of what Giordano could do to them. V2, who was twelve at the time of the trial, testified that she learned that Giordano was the mayor from V1 after she first met him. She "thought the Mayor could rule people, like be their boss."[3] She believed Giordano "would have someone hurt my family or that either I would get in trouble," because Jones "would threaten me pretty often, like everytime. And he would say that,

too, like you know, you're not supposed to tell." She also explained that she was afraid "[b]ecause I didn't know what a mayor was and I was afraid, because he had money and I was afraid he could have someone hurt my family and I was afraid he own everybody." V2 testified that the abuse hurt her physically and that it also "hurt [her] inside" "[be]cause [she] wouldn't think he would make [her] do something like that" and because she "wouldn't think [her] aunt would do something like that."

V1, who was ten at the time of the trial, testified that Jones told her that Giordano was the mayor and she understood that a mayor's role was to "[p]rotect the city" and "[w]atch[ ] over us, like God." V1 did not like the abuse, but told no-one about it because she was scared of Giordano. In particular, she believed she "would get put in jail" if she told other people because she "thought he had power." She also thought her mother would beat her. She did not remember whether Giordano had told her whether or not she should tell anybody about what they did.

The government also introduced 133 of the 151 wiretapped phone conversations between Giordano and Jones, including recordings corresponding to the particular phone conversations alleged in the indictment. Some of these calls corroborated Jones' testimony that Giordano sometimes explicitly requested that the girls be present and that he vehemently rejected offers to have Jones' 16–year–old niece come in-

---

2. Jones testified further that, in turn, she made sure that the girls did not tell anyone about the abuse by watching over them and giving them a certain look as if she were going to "give them a beating."

3. V2 had earlier testified that she "thought that he could rule over everybody and that he could boss everybody around" and "thought he was in charge of everything." She testified that she did not tell anyone "[b]ecause [she] was afraid." The government attorney took her through this line of questions a second time because her initial testimony was only partly audible in the courtroom.

stead.[4] The government adduced expert evidence that all of the calls were made on phones that were connected to the Public Switching Telephone Network, which is capable of transmitting phone signals between states. The evidence showed that the actual calls described in counts four through nine of the indictment, which were placed from and to Giordano's Nextel cellular phone, would necessarily have been routed through a switching center in White Plains, New York. The signals that constituted the calls described in counts eleven through eighteen of the indictment originated from or were received on a Cingular cellular phone and would not have left the State of Connecticut.

Giordano testified in his own defense. He admitted to paying Jones for sex beginning at some point prior to February of 1993 and to having "occasional" sexual contact with her from that time until his arrest, but denied ever having any sexual contact of any kind with either V1 or V2 or with Jones' 16–year–old niece. According to Giordano, Jones would sometimes bring various children including V1 and V2 with her to the law office, but would leave them in a sunroom several rooms removed from Giordano's office, where she would perform oral sex behind a closed door. Giordano claimed he "reluctantly agreed" to Jones' suggestion that he might enjoy re-

ceiving oral sex in the girls' presence on a handful of occasions; he had done so by leaving the office door open while Jones performed oral sex on him and V1 or V2 sat in the sunroom. On the second such occasion, he "didn't feel right" and closed the door. Giordano claimed that the girls had never come to his law office after the wiretapping began in February of 2001, and that none of the intercepted calls in which he asked for one or the other of them to be present actually resulted in their coming with Jones to meet him. He denied that his mention of either child in the intercepted phone calls was for the purpose of soliciting them for sexual contact; instead, he testified, "I had ask[ed] them to be there and she volunteered them to be there for the purposes of them being in the sun room at the time when she was performing oral sex on me . . . ."

Giordano made motions for acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case in chief and at the close of trial, both of which were denied. The jury convicted Giordano on every count of the indictment save one of the § 2425 counts, on which it returned no verdict.[5] After trial, Giordano again moved for acquittal on all counts, renewing the arguments previously rejected by the district court when it denied Giordano's pre-trial motion to dismiss the indictment.

4. The calls also contained evidence of consciousness of guilt, as well as evidence that Giordano was concerned the girls would report the abuse. In the call placed by Jones at the instigation of the FBI on July 21, in which she falsely told Giordano that her driver was demanding more money, Jones warned Giordano that she believed her 16–year–old niece had "r[u]n her mouth" to Jones' mother concerning the girls. Giordano replied: "How could she tell [your mother] sh*t, [the niece] was never with us when the girls were with us." About V2, Giordano said: "I thought you said she was solid, man, she wouldn't say sh*t." Later in the conversation, discussing

the putative demand for money that Jones had fabricated, Giordano told her:

> [I]f you give him more money, five days later he's gonna say he needs more money, and you know what, I'm not gonna f* *kin' keep doing it. No one seen me do sh*t. Period. And unless, unless, if you shut, if you keep your mouth shut, then everything's fine. . . . So what are the kids gonna say, I'll, I'll deny it. . . . Let me tell you somethin', you deny it and I deny it, they ain't gonna believe sh*t.

5. The count was subsequently dismissed on the government's motion.

38

The district court denied the motion for acquittal, holding, in relevant part, that (1) there was sufficient evidence that Giordano acted "under color of law" within the meaning of § 242, (2) the phone calls he made to and received from Jones satisfied the jurisdictional requirements of § 2425, and (3) use of § 2425 to prosecute this activity did not exceed Congress's power under the Commerce Clause. *United States v. Giordano*, 324 F.Supp.2d 349, 352–53 (D.Conn.2003) ("*Giordano II*"). On June 13, 2003, the district court sentenced Giordano principally to 444 months' imprisonment on each of the two § 242 counts; 60 months on the conspiracy count; and 60 months on each of the fourteen § 2425 counts, all to be served concurrently, for a total of 444 months of imprisonment. This timely appeal followed.

## DISCUSSION

### I.

#### A.

■ Section 2425 of Title 18 of the United States Code provides, in relevant part, that

> [w]hoever, using the mail or any facility or means of interstate or foreign commerce, ... knowingly initiates the transmission of the name, address, telephone number, social security number, or electronic mail address of another individual, knowing that such other individual has not attained the age of 16 years, with the intent to entice, encourage, offer, or solicit any person to engage in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined

under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 2425. Section 371 of Title 18 makes it a crime to conspire to commit the offense described in § 2425. As noted above, counts four through nine and eleven through eighteen of the indictment alleged that on fourteen specified dates between February 23 and July 12, 2001, Giordano and Jones used a cellular telephone and a landline telephone, respectively, to initiate the knowing transmission of the name of either V1 or V2 or both with the intent to solicit, entice, encourage, and offer them to engage in sexual activity. The third count of the indictment alleged that Giordano conspired to violate the statute.[6] The evidence adduced at trial showed that all of these calls were made while both Giordano and Jones were within the State of Connecticut. Giordano argues that § 2425 must be understood not to reach phone calls from one person in a given state to another person in the same state—what he terms "intrastate calls"—and that if the statute is understood to reach such calls, it exceeds Congress's power under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3, as that power has been defined by the Supreme Court in *Jones v. United States*, 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000), *United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). He therefore argues that the district court erred in denying his repeated motions to dismiss the indictment and in instructing the jury that they could convict Giordano of the phone counts if they found that the cellular phones were capable of transmitting communications from one state to another. We review *de novo* these

6. In the balance of this opinion we refer to these counts collectively as the "phone counts."

challenges to the meaning and constitutionality of the statute and the propriety of the jury instructions. *United States v. George,* 386 F.3d 383, 397 (2d Cir.2004); *United States v. Holland,* 381 F.3d 80, 84 (2d Cir.2004). These are issues of first impression in this Circuit and have not been addressed by any other circuit.

■ We address the issue of statutory interpretation first. The phrase "any facility or means of interstate . . . commerce" is not defined for purposes of § 2425 or the chapter of which it is a part. *See generally* 18 U.S.C. §§ 2421–2426. Recently, however, in *United States v. Perez,* 414 F.3d 302, 304 (2d Cir.2005) (per curiam), we reached the unremarkable conclusion that the national telephone network is a "facility of interstate . . . commerce" for purposes of the federal murder-for-hire statute, 18 U.S.C. § 1958(b)(2). *See also Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1048 (2d Cir.) (holding without discussion that a telephone network is an "instrumentality of interstate commerce" for purposes of Exchange Act § 10(b), 15

U.S.C. § 78j), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986).[7] We see no reason why the result should be different here. We also conclude that § 2425's prohibition on the transmission of the name of a minor "using . . . any facility or means of interstate . . . commerce" for the specified purposes includes the *intrastate* use of such a facility or means.[8] In *Perez,* we addressed a related question that has divided the circuit courts: whether an intrastate phone call was sufficient to satisfy the jurisdictional element of a prior version of the murder-for-hire statute, 18 U.S.C. § 1958(a), which prohibited "use[ ]" of a "facility in interstate . . . commerce" for specified purposes.[9] Joining the circuits that had held that the term "facility in interstate . . . commerce" was synonymous with the term "facility *of* interstate . . . commerce" in the definition section of the same statute, 18 U.S.C. § 1958(b)(2), we concluded that intrastate use of the telephone constituted use of a facility of interstate commerce within the meaning of the statute.[10] *Perez,*

---

7. These decisions are consistent with those of other circuits. *See, e.g., United States v. Corum,* 362 F.3d 489, 493 (8th Cir.2004) (holding that the "aggregate telephonic system" is "instrument of interstate . . . commerce" within the meaning of 18 U.S.C. § 844(e)); *United States v. Gilbert,* 181 F.3d 152, 158–59 (1st Cir.1999) (same); *United States v. Weathers,* 169 F.3d 336, 341 (6th Cir.1999) (noting that the telephone network is a "facility of interstate commerce" within the meaning of § 1958).

8. Giordano does not take a clear position on whether a phone call placed from a telephone located in a given state to another telephone within the same state is an "interstate" or "intrastate" call when the constitutive radio and electric signals cross state lines during the course of the phone call. While Giordano argues in passing that "there is insufficient evidence of interstate nexus" as to all of the phone calls listed in the indictment, this is plainly not true of the Nextel calls, the constitutive signals of which traveled through White

Plains, New York. Because Giordano does not distinguish between the various counts of the indictment in his challenge to the use of § 2425 in his case, we understand him to raise the broader argument that calls placed between persons located in the same state are "intrastate calls" no matter where the signals involved may fortuitously be routed.

9. Section 1958(a) was recently amended to proscribe use of a "facility *of* . . . interstate commerce," removing the ambiguity that created the circuit split addressed in *Perez. See* Intelligence Reform and Terrorism Prevention Act of 2004, Pub.L. No. 108–458, § 6704, 118 Stat. 3638, 3766 (striking from § 1958(a) "facility in" and inserting "facility of"); *Perez,* 414 F.3d at 305 n. 5.

10. *Perez* overruled contrary decisions of district courts in this circuit including *United States v. Paredes,* 950 F.Supp. 584 (S.D.N.Y. 1996), a case on which Giordano relies heavily in his briefs. In *Paredes,* the district court

414 F.3d at 304 (endorsing the reasoning of *United States v. Richeson,* 338 F.3d 653, 660 (7th Cir.2003) and *United States v. Marek,* 238 F.3d 310, 315–23 (5th Cir. 2001)). Likewise, § 2425, which unambiguously requires only that a "facility or means *of* interstate ... commerce" be used in the proscribed manner (emphasis added), is satisfied by purely intrastate use of that facility. *See id.*[11]

Because we find that the statute unambiguously reaches intrastate use of a telephone, we decline Giordano's invitation to apply the rules of lenity and constitutional avoidance to guide our interpretation. *See Salinas v. United States,* 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997) ("The rule [of lenity] does not apply when a statute is unambiguous ....."); *id.* at 62, 118 S.Ct. 469 (same as to the canon of constitutional avoidance and the principle that statutes will not be read to alter the traditional federal-state balance of power absent a clear indication of such intent). By the same token, we reject Giordano's argument that we should rely on the legislative history of the statute.[12] *See Virgilio v. City of New York,* 407 F.3d 105, 115 n. 10 (2d Cir.2005). The jurisdictional ele-

---

resolved the ambiguity in the former § 1958(a)'s use of the phrase "facility in interstate commerce" "with *Lopez* ... in mind," concluding that the statute should be understood to require actual interstate use of a facility. *Id.* at 589–90, 115 S.Ct. 1624. Giordano argues in his brief that the "facility of" language in § 2425 is "interchangeabl[e]" with the "facility in" language of former § 1958(a) for purposes of his argument, and that the *Paredes* court's *Lopez*-based reasoning as to the meaning of use of a "facility in interstate ... commerce" is therefore applicable here. In a letter-brief submitted after *Perez* was decided, Giordano changes tack, arguing that *Perez* is irrelevant because it "deal[s] with a completely different statute." Leaving aside this marked shift in strategy, neither contention is correct. *Paredes* was irrelevant to the issue at bar even before its abrogation, because it sought to address a patent ambiguity in the phrase "uses ... a facility in interstate ... commerce," while, as noted, § 2425 unambiguously requires only use of a "facility or means *of* ... interstate commerce." In contrast, *Perez,* which overruled *Paredes* in holding that § 1958(a) similarly proscribes use of a facility *of* interstate commerce, is squarely on point. For the same reason, contrary to Giordano's assertion, *United States v. Archer,* 486 F.2d 670 (2d Cir.1973), is of no aid to his argument. The *Archer* court suggested, without holding, that an intrastate phone call could not suffice to support jurisdiction under the then-extant version of the Travel Act, *id.* at 682–83, which included the jurisdictional requirement of use of a "facility in ... interstate commerce," *id.* at 678 n. 9 (quoting 18 U.S.C. § 1952). Its

dicta concerning the reach of that statute are therefore beside the point.

11. *Accord United States v. Drury,* 396 F.3d 1303, 1311 (11th Cir.2005) (holding that amended § 1958, proscribing certain uses *"of* a facility of interstate commerce," reaches intrastate phone calls; noting that the substitution of the phrase *"of* interstate commerce" for *"in* interstate commerce" "mak[es] the statute's jurisdictional reach crystal clear"); *Corum,* 362 F.3d at 493 (holding that intrastate phone call satisfied "use of the ... telephone ... or other instrument of interstate ... commerce" requirement of 18 U.S.C. § 844(e)); *Marek,* 238 F.3d at 318–19 (holding that intrastate use of Western Union satisfies § 1958(a)); *Gilbert,* 181 F.3d at 157–58 (holding that intrastate use of telephone satisfies § 844(e)); *Weathers,* 169 F.3d at 341 (noting in dicta that "[i]t is well established that telephones, even when used intrastate, constitute instrumentalities *of* interstate commerce"); *United States v. Baker,* 82 F.3d 273, 276 (8th Cir.1996) (holding that intrastate use of national ATM network "falls squarely within the literal language of the Travel Act," 18 U.S.C. § 1952).

12. We note, in any event, that Giordano's argument that Congress intended to regulate the use of the Internet under § 2425 but not the use of the national telephone network makes little sense given Congress's employment of the broad generic term "facility or means of interstate ... commerce" and the intimate relationship between the Internet and the national phone network.

ment of § 2425 is satisfied by intrastate use of a telephone capable of transmitting communications between states.

## B.

■ We turn now to Giordano's challenge to the constitutionality of § 2425 as we have interpreted it. In *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court identified three categories of activity that Congress may regulate under the Commerce Clause:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624 (citations omitted). The statute at issue in *Lopez* fell into the third category. The Court there held that the Gun–Free School Zones Act, 18 U.S.C. § 922(q), exceeded Congress's authority because it criminalized non-economic activity that did not "substantially affect" interstate commerce. *Id.* at 560–65, 115 S.Ct. 1624. Similarly, in *Morrison,* which concerned a provision of the Violence Against Women Act that provided civil remedies for gender-motivated violence, 42 U.S.C. § 13981, the Court held that Congress could not, under the third *Lopez* category, "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617, 120 S.Ct.

1740. In *Jones,* the Court considered whether the term "property used in ... any activity affecting interstate or foreign commerce" as employed in the federal arson statute, 18 U.S.C. § 844(i), reached a private dwelling. 529 U.S. at 858, 120 S.Ct. 1904. In reliance on *Lopez* and the principle that an ambiguous statute should be read to avoid doubtful constitutional questions, the Court held that it did not. *Id.* As the language of the statute and the Court's reliance on . *Lopez* make . clear, *Jones* too was a *Lopez* "category three" case, concerned with Congress's power to regulate activities having a substantial effect on interstate commerce.

It is certainly true, as Giordano argues, that these cases impose limits on Congress's power to create federal criminal prohibitions on traditionally state-regulated spheres of noneconomic activity. *See generally Gonzales v. Raich,* 545 U.S. 1, ——––——, 125 S.Ct. 2195, 2209–10, 162 L.Ed.2d 1 (2005); *United States v. King,* 276 F.3d 109, 111 (2d Cir.2002). But his attempt to bring this line of cases to bear on § 2425 overlooks the fact that § 2425, which explicitly proscribes "us[e of] the mail or any facility or means of interstate ... commerce" to specified ends, is clearly founded on the second type of Commerce Clause power categorized in *Lopez,* that is, the power to regulate and protect the instrumentalities of interstate commerce "even though the threat may only come from intrastate activities." *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624. It is well-established that when Congress legislates pursuant to this branch of its Commerce Clause power, it may regulate even purely intrastate use of those instrumentalities. *United States v. Gil,* 297 F.3d 93, 100 (2d Cir.2002) (collecting cases).[13] Application

---

**13.** *See also, e.g., Gilbert,* 181 F.3d at 158 (rejecting challenge to prosecution under

§ 844(e) for intrastate phone call; holding that *"Lopez* does not apply because a tele-

of § 2425 to the conduct involved in this case therefore presents no constitutional difficulties.[14]

## II.

### A.

Giordano also challenges his conviction of two counts of violating 18 U.S.C. § 242. That statute "mak[es] it criminal to act (1) 'willfully' and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States."[15] *United States v. Lanier,* 520 U.S. 259, 264, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). The first count of the indictment charged that between November 2000 and July 2001, Giordano, "while acting under color of the laws of the State of Connecticut," deprived V1 of her Fourteenth Amendment right "to be free from aggravated sexual abuse and sexual abuse ... by coercing and forcing [V1], who had not attained the age of 12 years, to engage in fellatio and genital contact with [Giordano] and by touching [V1's] genitals and breasts, resulting in bodily injury to V1."

Count two of the indictment contained the same charges as to V2.

■ Giordano argues that the evidence was insufficient as to the "under color of law" element of these counts. We disagree because the meaning of the statutory term "under color of ... law" is more expansive than Giordano maintains, and the evidence adduced at trial, viewed as it must be in the light most favorable to the government, was more than sufficient to allow a rational trier of fact to find the element satisfied beyond a reasonable doubt. *See United States v. Singh,* 390 F.3d 168, 187 (2d Cir.2004).

■■ "The Supreme Court has broadly interpreted the color of law requirement, concluding that '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law.'"[16] *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed.

---

phone is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction based on interstate commerce"); *Kerbs v. Fall River Indus.,* 502 F.2d 731, 738 (10th Cir.1974) ("[A]s long as the instrumentality itself is an integral part of an interstate system, Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control."), *abrogated on other grounds, Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

14. Giordano devotes several paragraphs of his brief to a challenge to the sufficiency of the evidence supporting the phone counts. This challenge rests entirely on the interpretive and constitutional arguments we have just discussed and fails for that reason. Giordano does not challenge the sufficiency of the evidence that he and Jones used telephones linked to a network capable of making interstate calls.

15. The statute provides, in relevant part, that

[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State ... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution ... of the United States, ... if such acts include ... aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, ... shall be fined under this title, or imprisoned for any term of years or for life ....

18 U.S.C. § 242.

16. The "under color of law" requirement of § 242 is identical to the requirement under 42 U.S.C. § 1983 that an official act under color of law. *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Our discussion therefore draws on cases relating to both statutes.

1368 (1941) (further internal quotation marks omitted; alteration in *Walsh* )). The fact that someone holds an office or otherwise exercises power under state law does not mean, of course, that any wrong that person commits is "under color of law." "It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). As we have observed, however, "there is no bright line test for distinguishing personal pursuits from actions taken under color of law." *Pitchell v. Callan,* 13 F.3d 545, 548 (2d Cir.1994) (internal quotations marks omitted).[17]

■ Giordano argues that he cannot have acted under color of law because his actions, although they took place during his mayoralty, "were clearly a part of and derived from [a] personal relationship [he] had with [Jones]" that was unrelated to and predated his mayoralty.[18] The color of law element may be satisfied by the fact that an official gains access to the victim in the course of official duty. *See, e.g., United States v. Livoti,* 196 F.3d 322, 327 (2d Cir.1999) (rejecting sufficiency challenge to § 242 conviction where on-duty police officer choked victim who had protested officer's arrest of victim's brother); *United States v. McClean,* 528 F.2d 1250, 1252, 1255 (2d Cir.1976) (holding that police officers acted under color of law when they stole and extorted proceeds of narcotics sales from suspects of their investigations).

But this is by no means a necessary condition: it is well-established that an official may act under color of law even when he or she encounters the victim outside the conduct of official business and acts for reasons unconnected to his or her office, so long as he or she employs the authority of the state in the commission of the crime. *See Walsh,* 194 F.3d at 51 ("The relevant question ... is not whether the actual abuse was part of the official's duties but, rather, whether the abuse was 'made possible only because the wrongdoer is clothed with the authority of state law.' " (quoting *Classic,* 313 U.S. at 326, 61 S.Ct. 1031)); *Pitchell,* 13 F.3d at 548 ("[L]iability may be found where [an official], albeit off-duty, nonetheless invokes the real or apparent power of [his office]."). Thus we have found that officials acted under color of law even when, like Giordano, they came into contact with their victims in the course of their private affairs. *See, e.g., Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003) (holding that off-duty police officer acted under color of law when he identified himself as a police officer and drew his gun on motorist with whom he had argument over use of roadside payphone); *Rivera v. La Porte,* 896 F.2d 691, 695–96 (2d Cir.1990) (holding that off-duty corrections officer acted under color of law when he arrested and assaulted driver following private argument during traffic jam).

Nor do the facts that Giordano's crime had, as he asserts, "nothing whatever to do with [his] actual or pretended mayoral duties" or that he acted for "his own per-

---

**17.** *See also Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1303 (11th Cir.2001) ("Whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing. It is only through a process of sifting facts and weighing circumstances that we arrive at a correct determina-

tion." (internal quotation marks and citations omitted)).

**18.** Giordano does not concede that he had sexual contact with the girls, but makes this argument assuming *arguendo* that a reasonable jury could have found his conduct deprived the victims of federally-protected rights.

sonal ... gratification" end the "color of law" inquiry. The terms of 18 U.S.C. § 242 provide for enhanced penalties for a variety of acts, including aggravated sexual assault, none of which would be undertaken for official reasons, and some of which involve purely personal, albeit perverse, gratification. The language of the statute thus makes clear that the such acts cannot, by their nature alone, defeat an assertion that they were performed under "color of law."

Moreover, we have found that officials acted under color of law when their misuse of official power made the commission of a constitutional wrong possible, even though the official committed abusive acts for personal reasons far removed from the scope of official duties. In *Monsky v. Moraghan*, 127 F.3d 243 (2d Cir.1997), we concluded that a § 1983 complaint could not be dismissed for failure to plead action under color of law when it alleged that a state judge allowed his dog to approach and "aggressively nuzzle" a litigant who was researching records in the court clerk's office. *Id.* at 244. Although we noted that "[t]he complaint does not allege the typical actions of a state judicial officer that would plainly fall within the ambit of actions taken under color of law [such as] ... presiding at trial or rendering judgments," we concluded that the complaint adequately alleged action under color of law because it charged that the judge "was known to, and deferred to by, personnel of the office" and "was allowed to enter the office with his dog and remain there ...

because he was a judge."[19] *Id.* at 246. Similarly, in *United States v. Tarpley*, 945 F.2d 806 (5th Cir.1991), a decision which we have repeatedly cited with approval, *see Monsky*, 127 F.3d at 246; *Pitchell*, 13 F.3d at 548, the Fifth Circuit held that a police officer acted under color of law when he lured his wife's lover to the officer's home, beat him, and threatened to kill him if he reported the incident, telling his victim, "I'll kill you. I'm a cop. I can." 945 F.2d at 808. The court rejected the officer's argument that he acted only as a jealous husband and not as a police officer, finding that his "claim[ ] to have special authority for his actions" and the fact that he and a fellow officer then escorted the victim from the town satisfied the color of law requirement because "the air of official authority pervaded the entire incident." *Id.* at 809.

Of particular relevance to the case before us, this Court found that a state official acted under color of state law even when acting outside the ambit of official duty because the official used his or her power to make the crime possible by causing the victim to submit. In *Walsh*, we affirmed a conviction under § 242 of the defendant prison guard who sadistically assaulted an inmate, Fowlks, by ordering him to kneel and expose himself such that Walsh could step on his penis in an excruciating manner. 194 F.3d at 41–43. Walsh was also convicted of two other counts under § 242 for assaulting Fowlks in the same or similar manner. *Id.* at 42–43. In rejecting Walsh's argument that

---

**19.** Our dissenting colleague rejects *Monsky* as "an outlier of a case" and suggests that its reasoning is *dicta* because the panel went on to find that the complaint, erroneously dismissed for failure to allege action under color of law, nonetheless failed to allege the deprivation of a federally protected right. *Post* at 50. The alleged facts of *Monsky* were, as the panel noted, "most unusual." 127 F.3d at 244. This is cause to be thankful, but it does not diminish the soundness of the panel's reasoning. If § 242 were understood to reach only abuse closely related to the nature of the official's legitimate duties, then the statute would perversely fail to offer protection against more wanton misuse of state power.

his assault was not undertaken under color of law, we held:

> The fact that the defendant was a corrections officer, in charge of supervising, caring for, and disciplining the victim, provided Walsh with the access and opportunity to *exercise his power over* Fowlks. To say that Fowlks *would have submitted* to any other individual, who did not have the same degree of power over him as the defendant, is a factual assumption we decline to make.

*Id.* at 51 (emphasis added). We acknowledged and did not find it necessary to refute the defendant's point that a visitor or a fellow inmate could also have assaulted the inmate. *Id.* Our holding therefore did not turn on the fact that Walsh's office gave him unique access to Fowlks; as the emphasized language above makes clear, it was the fact that Walsh was cloaked with authority to order Fowlks to submit to repeated assaults that made the difference. *Id.*

In the same vein, the Eleventh Circuit held in *Griffin v. City of Opa–Locka,* 261 F.3d 1295 (11th Cir.2001), that the rape of a city employee by the city manager after hours in the employee's home was perpetrated "under color of law" because, *inter alia,* the manager "invoked his authority . . . to create the opportunity to be alone with [the victim]" by coercing her into consenting to accept a ride home, "reminded her of his authority" immediately prior to the rape by saying " 'I can't believe you are telling me no after everything that I

have done for you,' " and then "continued to invoke his authority over [her] to harass her and humiliate her even after the sexual assault" by summoning her to his office and referring obliquely to the rape in the presence of co-workers. *Id.* at 1304–06.

Considering the totality of the circumstances and drawing all inferences in the light most favorable to the government, the evidence was easily sufficient to show that Giordano, like the officer in *Tarpley,* threatened his victims by invoking a "special authority" to undertake retaliatory action, and that like the officials in *Walsh* and *Griffin,* he used his authority to cause the victims to submit to repeated abuse, in this case by causing the victims to fear that he would use his power to harm them if they reported the abuse. Both V1 and V2 testified that they did not like Giordano's repeated abuse, but that they were made to understand that he could jail or otherwise harm them and their families if they reported it. Jones, for her part, testified that on each occasion after Giordano was done abusing the girls and before they left he told her "to make sure the kids don't tell anyone [or] I'll get in trouble, I'll go to jail. . . . So I made sure they never said anything to anybody." Jones also testified that Giordano told the girls the same thing directly: "They will get in trouble, and [she would] go to jail." She testified that she ensured they told no-one "because I was scared. I didn't want to go to jail." [20] She further testified that Gior-

---

**20.** The dissent argues that any customers of a prostitute could make the same threat with equal credibility, and that Giordano's threats were the equivalent of any client's "demand[ ]" of confidentiality when engaging in an illegal act. *Post* at 50. Similarly, the dissent asserts that such "threats" were more akin to warnings, that any friend would give to someone engaged in so many forms of illegal behavior. *Post* at 51. We respectfully disagree. The jury could very easily have

concluded that the statements by Giordano that Jones would go to jail was more than a warning and that Giordano's threat carried far more weight than would a threat from a civilian customer. An ordinary citizen paying a prostitute for sex with children would be foolish in the extreme to arrange for the prostitute's prosecution, since his own conduct is a felony; any threat to do so would necessarily ring hollow. A mayor with manifest au-

dano repeatedly mentioned his presence at crime scenes, and understood from that and his request that she call him at home so he could tell his wife that he was needed on police business, that "he had a lot to do with the police .... He had control of what the police does ...."[21] This evidence was sufficient to satisfy the government's burden of showing that Giordano invoked "the real or apparent power" of his office to make the continuing sexual abuse possible.[22] *Pitchell*, 13 F.3d at 548.

Undaunted, Giordano objects that under *Pitchell*, the fact that the victims feared that he could use his power as mayor to harm them and their families cannot be

relevant to whether he acted "under color of law," because we observed in that case that a victim's "subjective reaction" to a police officer's conduct "misses the essence of the color of law inquiry." 13 F.3d at 548–49. That remark, however, was directed to a different argument altogether.

In *Pitchell*, the plaintiff ran into a police-officer friend and his partner, Callan, at a bar and went back to Callan's apartment. *Id.* at 547. After drinking and idle discussion about "a variety of topics including Vietnam, former President Kennedy, and the movie 'Platoon,'" Callen brought out his gun and shot Pitchell. *Id.* We held that an officer's drunken shooting of a

---

thority over the city's police has vastly more credibility in threatening prosecution.

Nor did the fact that Jones acted at least in part from financial motives in making the girls available for abuse prevent the jury from rationally finding that Giordano acted under color of law in carrying out the repeated abuse. Jones testified candidly and at some length about her crack habit and the fact that she prostituted the girls and her older niece because she needed the money for drugs. She also testified, however, that it was Giordano who first demanded that Jones bring children to perform oral sex, at a time when he was already the mayor, that she initially demurred, and that she "did anything [Giordano] asked her to" because she "figured [she]'d go to jail" if she refused. At some point after the abuse began in November of 2000, she wanted to stop bringing the girls because she "didn't like having to sit there and watching them do that. They didn't want to do it anymore." On occasion she failed to keep an appointment to bring the girls to see Giordano because she "didn't want to bring them up there" and because the girls did not want to go. Jones also testified that she told them not to tell anyone because she "was told to tell them that."

**21.** Tellingly, Jones testified also that when she was arrested by the FBI on July 21, 2001, the first thing she said to the arresting officers was "Did Phil [Giordano] send you?"

**22.** The dissent's assertion that the facts of this case are "indistinguishable" from a situation

in which a bookie pays out the winnings of an illegal bet made by a mayor, *see post* at 50, misunderstands the nature of the abuse to which the young victims were subjected. In the case of the illegal bet, a bookie takes the mayor's money to post the bet knowing that there is some possibility that the mayor will win. That is the bookie's business. In consequence, it cannot be said that the mayor's authority makes possible the bookie's agreement to honor the business transaction. By contrast, VI and V2 did not submit to the abuse willingly and both testified that they did not report the abuse because they feared that Giordano, who "had power," would jail them or harm their families.

Moreover, even if we were to accept our colleague's assertion that Giordano's first encounter with the child victims may have been an insufficient basis for a reasonable jury to find that he was acting under color of law when he sexually abused them, it was, nonetheless, entirely reasonable for the jury to infer that the aura of power that Giordano invoked as mayor then allowed him to convey to the two young victims that they would get in trouble, and that Jones would go to jail, if they told anyone of the abuse. The jury could reasonably have inferred as well that Giordano's apparent power, *see Pitchell*, 13 F.3d at 548, thereafter deprived the child victims of any opportunity to report what had happened or otherwise to resist their continuing victimization.

voluntary guest in a private home was not "invok[ing] the authority of the police department" or acting within the line of duty. *Id.* at 548. We also rejected Pitchell's "novel" argument that the color of law requirement could be satisfied by the fact that the presence of both off-duty officers "had a numbing effect on his defenses," causing him not to flee when Callan first brandished the gun. *Id.* Pitchell did not claim that he felt under some obligation to remain or submit to the officers' dangerous behavior because they were police. *See id.* Instead, he claimed that he trusted the officers to behave more professionally than they did and consequently did not take whatever measures he could have when he first saw Callen's gun. We held that Pitchell's subjective sense of ease with the officers was irrelevant in light of the lack of any "abuse or misuse of state power." *Id.* at 549. That holding is inapposite to the question whether the jury could have found that Giordano acted under color of law. The evidence here, viewed in the light most favorable to the government, supports the finding that Giordano actively and deliberately used his apparent authority as mayor to ensure that the victims did not resist or report the ongoing abuse. In consequence, there was sufficient evidence on the basis of which the jury could find beyond a reasonable doubt that the abuse was " 'made possible only because the wrongdoer is clothed with the authority of state law.' " *Walsh,* 194 F.3d at 51 (quoting *Classic,* 313 U.S. at 326, 61 S.Ct. 1031).

### B.

 Giordano also challenges the sufficiency of the evidence as to the third element of a § 242 offense, arguing that V1 and V2 had no federally protected right to be free from aggravated sexual abuse when such abuse did not satisfy the jurisdictional requirements of federal statutory sexual abuse crimes. This argument is baseless. Section 242 punishes those who, under color of law, subject a person to the "deprivation of any rights ... secured or protected by the Constitution," including rights secured by the Fourteenth Amendment, *Lanier,* 520 U.S. at 272 n. 7, 117 S.Ct. 1219. "It is incontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment." *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 451–52 (5th Cir.1994) (en banc); *see also Spencer v. Doe,* 139 F.3d 107, 112 (2d Cir.1998) (noting that juvenile detainee had the right to be protected from sexual molestation under Fourteenth Amendment); *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 506 (6th Cir.1996) (holding that "a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee"); *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 727 (3d Cir.1989) (same).

We hold, in sum, that Giordano's crime was committed "under color of state law" within the meaning of § 242 because Giordano used the victim's fear of the power he wielded as mayor to keep them from reporting the ongoing abuse, and that the victims had a right under the Fourteenth Amendment to be free from sexual abuse by a state actor. We therefore reject Giordano's challenge to the sufficiency of the evidence as to the § 242 counts and affirm the district court's denial of his motions for acquittal.

### III.

 Giordano renews his argument that the district court should have recused itself from ruling on the admissibility of

the wiretap evidence against him because it had earlier authorized the Title III applications and supervised the wiretap. As noted above, we previously denied his petition for a writ of mandamus seeking to overturn the district court's rejection of his recusal motion. *Giordano III*, slip op. at 1. We adhere to our former ruling, but write to explain our reasoning. Section 455(a) of Title 28 of the U.S.Code requires the recusal of a judge or magistrate "in any proceeding in which his [or her] impartiality might reasonably be questioned." We review the denial of a motion for recusal under that statute for abuse of discretion. *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999). In *Liteky v. United States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Supreme Court held that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555, 114 S.Ct. 1147. The authorization of a wiretap under Title III does not "evidence the degree of favoritism or antagonism required" to necessitate recusal under § 455(a) from ruling on the admissibility of the resulting evidence. *See id.* We therefore join both of the circuits that have considered this argument and rejected it. *See United States v. Lewis,* No. 03–3131, 139 Fed. Appx. 455, 458–59, 2005 WL 1678981, *3 (3d Cir. July 19, 2005); *United States v. Jones,* 801 F.2d 304, 312 (8th Cir.1986); *cf. Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482, 490–91 (1st Cir.1989) (noting that judge who authorized wiretaps was not required to recuse himself from civil suit against participants in wiretap); *United States v. de la Fuente,* 548 F.2d 528, 541 (5th Cir.1977) (noting that a judge who had ruled on suppression of wiretap evidence was not required to recuse himself from the subsequent trial).

## CONCLUSION

For the foregoing reasons, we hold that (1) 18 U.S.C. § 2425 reaches intrastate use of telephone for the specified unlawful purposes and that application of the statute to such activity does not exceed Congress's power under the Commerce Clause, U.S. Const. art. I § 8, cl. 3; (2) the evidence was sufficient to sustain Giordano's conviction for civil rights violations under color of law under 18 U.S.C. § 242; and (3) the district court did not abuse its discretion in failing to recuse itself. In light of these holdings and because the arguments addressed in the summary order lack merit, we affirm the judgment of conviction.

DENNIS JACOBS, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from so much of the majority opinion as affirms Giordano's conviction for civil rights offenses under color of law pursuant to 18 U.S.C. § 242. Despicable as the conduct was, there is no sufficient evidence that it was done under color of law. Several points demonstrate the insufficiency.

(1) Color of law overlays a deprivation of a constitutional right when the deprivation is achieved by a "[m]isuse of power, possessed by virtue of state law *and made possible only* because the wrongdoer is clothed with the authority of state law." *United States v. Classic,* 313 U.S. 299, 325–26, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (emphasis supplied); *see also Screws v. United States,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1944); *United States v. Walsh,* 194 F.3d 37, 51 (2d Cir.1999). It is not enough for the government to show that abuse of government power was a contributing cause or background influence in the deprivation of the victim's rights; it must be the *but-for* cause. So it was the government's burden to prove beyond reasonable doubt that, but for the accused's position of municipal authority, the wrong

that was done would not have been possible.

That but-for requirement shapes the case law involving physical abuse into with a few repeated scenarios: a police officer using brutal force during an arrest; an off-duty officer, who is out of control, inflicting punishment; or (more commonly) a prison guard abusing an inmate within the confines of the prison walls. *See, e.g., Screws,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (holding that a sheriff and two other law enforcement officials acted under color of law when they beat to death a young detainee during the course of his arrest); *Walsh,* 194 F.3d 37 (concluding that a corrections officer acted under color of law when he stepped on an inmate's genitals). But for the position of power, the victim could not be reached, or be made to submit, or be kept silent.

In these paradigm cases, the but-for cause of the abuse is apparent, and a jury needs no special instruction to understand that the abuse was made possible by the abuser's position. *See, e.g., Pitchell v. Callan,* 13 F.3d 545, 548 (2d Cir.1994) ("[L]iability may be found where [an official], albeit off-duty, nonetheless invokes the real or apparent power of [his office]."). In Giordano's trial, however, the district court omitted the crucial word "only" that *Classic* requires, and thus charged: "Misconduct made possible because the public official is clothed with the authority of the law is action under color of law." The inadequacy of this instruction is not raised on appeal, and need not be considered; but Giordano has preserved the argument that the evidence was insufficient under the "color of law" standard set forth by the Supreme Court. And I conclude that no reasonable juror could find properly that this defendant acted under color of law.

(2) In order to demonstrate that Jones and the children succumbed to Giordano's powers as mayor, the majority opinion adduces snippets of transcript (in footnotes 20 and 21) that evidence at best the victims' subjective reactions (that they were impressed, and so forth). *Ante* at 44 n.19 & 45–46 n.20. However, focus on a victim's subjective reaction "misses the essence of the color of law inquiry." *Pitchell,* 13 F.3d at 548. Even assuming that such subjective testimony could suffice, the government did not ask the victims if they submitted because of Giordano's mayoral powers—a telling omission since the government was in a position to know the answer.

Demonstrably, Giordano's position as mayor of Waterbury was *not* the but-for and indispensable means of the child abuse.

- Giordano's access was arranged by Jones, a prostitute he had patronized well before he was elected.

- The children were provided to him for an agreed-upon consideration that was paid. Jones testified as to her incentives: she wanted money to feed her crack habit.

- The mayor's money was as good as anyone else's; and there is no evidence that Jones would have refused the transaction or developed any additional scruple if her customer had not been mayor.

- Most of the abuse of the children (by far) took place at Giordano's private law office, at Jones' home or Giordano's, or in an apartment belonging to a friend of Giordano. Abuse occurred at City Hall or in a government vehicle no more than a handful of times.

The only available inference is that the sole cause of the abuse was that a sexual predator had access to sufficient cash (and a willing facilitator) to purchase the sexual services of children. Analytically, there is

no distinction between the supposed threat in this case and any instance in which the customer of a prostitute demands confidentiality—except that the customer is a mayor. All would have happened as it did happen if Giordano had been an architect.

The fact that the mayor of a small city commands a police force does not mean that every illegal, unenforceable contract he enters into is made possible because of his office—*i.e.*, under color of law. If a mayor hits the trifecta, his bookie may be most unhappy about paying, and may appreciate the mayor's power to get him arrested; a warning to keep quiet about the illegal transaction would be implicit whether or not recited; and the fact of office would be evident. Still, it cannot seriously be argued that a bookie's payment under those circumstances would be extorted under color of law. The situation is indistinguishable from Giordano's, as the government all but conceded at oral argument.

(3) This case differs from every other template case upon which the majority relies, in that Giordano did not use his power to cause the victims to submit, as in *Walsh*, 194 F.3d at 41–43; or to create the opportunity to be alone with the victims and coerce them, as in *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1306 (11th Cir.2001); or to assert special authority for the misconduct or to undertake retaliatory action, as in *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir.1991) (Higginbotham, *J.*).

The majority cites *Monsky v. Moraghan*, 127 F.3d 243 (2d Cir.1997), an outlier of a case involving a judge who permitted his dog to go about sniffing rudely at persons in the office of the court clerk. That case could not be dismissed on the pleadings (after all, some people in the clerk's office presumably tolerated the invasion because the judge had power over

them), but no holding in *Monsky* supports the majority opinion.

(4) More instructive is *Tarpley*, on which the majority relies. In *Tarpley*, a cuckolded deputy sheriff was found to have acted under color of law after he (together with another deputy) lured his wife's lover to a house, beat his rival with a cosh, put a service pistol into his mouth, drove him out of town in a police car, and warned him that a cop can get away with it. 945 F.2d at 807. The Fifth Circuit affirmed Tarpley's conviction under 18 U.S.C. §§ 241 and 242. *Id.*

Tarpley has persuasive impact on Giordano's case chiefly because the fact scenarios provoke so many distinctions. Giordano's conduct made no critical use of his office. Giordano paid an agreed price to abuse the children; he made no claim of power to do so based on official authority, apparent or actual. Giordano made no threat to use official power to harm Jones or the children; the warning about trouble and jail applied with infinitely greater force to himself (no one could assume he would precipitate a prosecution that chiefly would ensnare himself). Giordano acted alone, without enlisting any other person wielding power of law; so no one could think he was exercising a power backed by government force. Giordano employed no trappings of office to inflict the harm (such as the service pistol and the squad car trip in *Tarpley* ). And Giordano abused the children surreptitiously, without spinning an aura of official conduct.

The facts in this case are inverse to the facts that in *Tarpley* were held sufficient to support the inference that misconduct had the color of law:

[t]here was sufficient evidence in the record from which a rational juror could conclude that Tarpley was acting under color of law. Tarpley did more than simply use his service weapon and iden-

tify himself as a police officer. At several points during his assault of Vestal, he claimed to have special authority for his actions by virtue of his official status. He claimed that he could kill Vestal because he was an officer of the law. Significantly, Tarpley summoned another police officer from the sheriff's station and identified him as a fellow officer and ally. The men then proceeded to run Vestal out of town in their squad car. The presence of police and the air of official authority pervaded the entire incident.

*Id.* at 809. To offset these fact distinctions, the majority opinion leans heavily on the ambient impression of the mayoral office; but in so doing, the majority opinion vastly overstates the pomp and grandeur that surrounds the mayor of the fifth-largest city in Connecticut.

(5) Giordano raised the danger of jail if the prostitution of the children were disclosed; but there is nothing in the record from which to infer that such a statement acted as compulsion. Moreover, the threat of prison was no less than factual. A drug-addicted procurer of children of course belongs in jail. She acknowledged as much at trial:

Q. Did the Mayor say anything to you after this happened?

A. Yep.

Q. What did he tell you?

A. He told me make sure the kids don't tell anyone and I'll get in trouble, I'll go to jail.

\* \* \* \* \* \*

Q. He told you you were going to go to jail?

A. Yeah, he told me I'll go to jail. I'm there now.

Defendant's statement was a warning; he was in no position to issue it as a threat. And that admonition is characteristic of virtually every child abuse case—it had nothing to do with the fact that Giordano was mayor. Any friend would give her the same warning.

The threat of disclosure followed by jail was much more a threat in the hands of Jones. Indeed, she successfully blackmailed Giordano on the pretext of providing hush money for one of the drivers who brought Jones and the children to the assignations.