**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

TRACY MORGAN, a/k/a Tre Dog,
KILLIU FORD, a/k/a Caveman,
AUGUSTUS SANFORD, a/k/a Turk,

  Defendants - Appellants.

No. 12-1408, 12-1442, 13-1032

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:11-CR-00303-REB-1; 1:11-CR-00303-REB-2; 1:11-CR-00303-REB-3)**

Richard A. Hostetler, Law Office of Richard A. Hostetler, Denver, Colorado, appearing for Appellant Tracy Morgan.

Ronald Fujino, Salt Lake City, Utah, appearing for Appellant Killiu Ford.

Jeffrey S. Pagliuca, Haddon, Morgan, and Foreman, P.C., Denver, Colorado, appearing for Appellant Augustus Sanford.

John F. Walsh, United States Attorney, and Paul Farley, Assistant United States Attorney, Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.

Before **HOLMES, MATHESON,** and **BACHARACH,** Circuit Judges.

**MATHESON,** Circuit Judge.

Tracy Morgan, Killiu Ford, and Augustus Sanford (the "Defendants") were indicted and tried together. A jury convicted them of kidnapping, conspiracy to kidnap, and possession of a firearm during a crime of violence. Each defendant brought a separate appeal, raising overlapping but not identical issues. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm as to each defendant.

## I. BACKGROUND
### A. *Factual History*[1]

In August 2009, Mr. Morgan and his friend, Marvin Tabor,[2] plotted to kidnap and rob Mario Armendariz. Pursuant to their plan, Mr. Morgan attached a GPS tracking device to Mr. Armendariz's car while Mr. Armendariz was visiting Mr. Tabor's home. Mr. Tabor then tracked Mr. Armendariz's location on the Internet using Google Maps, enabling Mr. Morgan and Mr. Ford to follow Mr. Armendariz in their vehicle.

---

[1] This factual history is based on evidence presented at trial.

[2] Mr. Tabor was a co-conspirator who testified for the Government at trial. Xallier Patterson, Mr. Tabor's stepbrother, was also a co-conspirator who testified for the Government at trial. Mr. Patterson's exact involvement in the crime is unclear from the record.

Also in late summer 2009, Mr. Tabor's brother-in-law, Mr. Sanford, persuaded a police officer's minor child to steal four weapons and parts of a police uniform—including cargo pants, a black police shirt, and an orange reflective vest—from his father in exchange for two ounces of marijuana. Mr. Sanford also painted his Chevrolet Tahoe black.

Around 11:00 p.m. on September 22, 2009, the Defendants and Mr. Tabor met at Mr. Tabor's house. Mr. Sanford wore the stolen police gear. The Defendants then departed to locate Mr. Armendariz. Mr. Tabor remained at his home and tracked Mr. Armendariz using the GPS device and Google Maps, speaking with the Defendants on a cell phone to update them with Mr. Armendariz's location.

That night, Mr. Armendariz and his wife, Perla Flores, were getting into their car with their two young daughters outside of a cousin's house when they saw two armed men exit a black Chevrolet Tahoe and at least one other man arrive from across the street. The men announced they were police officers and ordered Ms. Flores and Mr. Armendariz to lie on the ground. One of the men was wearing a reflective police vest. Evidence at trial established the Defendants were present.

Two of the men zip-tied Mr. Armendariz's arms and legs together, covered his head, and put him into the back of the Tahoe. Mr. Ford got into the Tahoe and questioned Mr. Armendariz about where he kept his money while an unknown co-

conspirator drove the Tahoe around. Eventually the Tahoe dropped off Mr. Ford at Mr. Armendariz's home. The Tahoe drove away and parked in a different location.

Meanwhile, Mr. Sanford drove Ms. Flores and her daughters in her car to the Flores-Armendariz home. Mr. Ford and Mr. Morgan[3] met him there. The Defendants confronted Ms. Flores, demanding to know where Mr. Armendariz kept his money. Ms. Flores refused to tell them.

Mr. Morgan put a gun to the three-year-old daughter's head, and Ms. Flores then told them the money was under her daughter's dresser. Mr. Morgan retrieved $30,000 from under the dresser and left the home. Mr. Sanford and Mr. Ford continued to search the house, but after realizing Mr. Morgan had already left with the money, they also exited the home.

Ms. Flores left the house looking for help. She saw a black sport utility vehicle pick up Mr. Sanford and Mr. Ford. The driver then drove away from the home, stopped several miles away, and dropped off Mr. Armendariz on the side of the road.

Later that night or early the next morning, Mr. Ford and Mr. Sanford looked for Mr. Morgan and found him at a Taco Bell. They divided the money Mr. Morgan took from Mr. Armendariz's home.

---

[3] The record is not clear how Mr. Morgan travelled to or from the Flores-Armendariz home.

Mr. Sanford returned to Mr. Tabor's home and complained to Mr. Tabor and Mr. Patterson about Mr. Morgan's keeping too much of the proceeds. Mr. Ford called Mr. Tabor's home to discuss the kidnapping and robbery with Mr. Tabor and Mr. Patterson. He also complained that Mr. Morgan kept more than his share of the money.[4] Mr. Morgan joined the phone call for a brief moment and told the others he would arrive at Mr. Tabor's house within several hours. The group met at Mr. Tabor's house and redistributed the proceeds from the kidnapping and robbery.

## B. *Procedural History*

A grand jury indicted the Defendants on two counts of kidnapping in violation of 18 U.S.C. § 1201(a)(1) for kidnapping Mr. Armendariz and Ms. Flores; two counts of kidnapping in violation of 18 U.S.C. §§ 1201(a)(1) and 3559(f)(2) for kidnapping the couple's two minor children; one count of conspiracy to kidnap in violation of 18 U.S.C. § 1201(c); and one count of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c).

The Defendants were tried together. The jury found each of them guilty on all counts. Mr. Morgan and Mr. Ford were each sentenced to 600 months in prison, and Mr.

---

[4] Law enforcement intercepted and recorded this phone call as part of an ongoing wiretap in a separate drug investigation. The recorded phone call was admitted as Exhibit 14A at trial. A transcript of the phone call was admitted as Exhibit 14B.

Sanford was sentenced to 384 months.  Each defendant timely filed his notice of appeal.  We will discuss additional procedural history as it pertains to each issue addressed below.

Although the appeals were not formally consolidated, the Government filed only one answer brief, and the cases were argued consecutively at oral argument.

## II. **DISCUSSION**

The Defendants raise seven issues.  Only one applies to all three Defendants.  First, Mr. Sanford and Mr. Ford challenge the constitutionality of the federal kidnapping statute.  Second, Mr. Ford challenges the district court's jury instructions.  Third, the Defendants all argue the district court violated Federal Rule of Evidence 801(d)(2)(E) and the Sixth Amendment in admitting the post-kidnapping phone call.  Fourth, Mr. Morgan contends the district court erred by not declaring a mistrial after the jury heard the post-kidnapping phone call based on a violation of Federal Rule of Evidence 404(b).  Fifth, Mr. Sanford and Mr. Morgan argue the district court erred in denying their motions for mistrial after Ms. Flores testified she could identify one of the perpetrators but did not make the identification.  Sixth, Mr. Sanford alleges the district court erred in denying his motion for severance.  Seventh, Mr. Morgan contends there was reversible cumulative error.

## A. *Constitutionality of Federal Kidnapping Statute*

Mr. Sanford and Mr. Ford argue the district court should have dismissed the indictment because (1) Congress lacked Commerce Clause authority to enact the Federal Kidnapping Statute, 18 U.S.C. § 1201(a)(1), as amended in 2006; and (2) the statute was

unconstitutionally applied here.[5]  We review the as-applied challenge de novo.  *See*

*United States v. Carel*, 668 F.3d 1211, 1216 (10th Cir. 2011).  Because we conclude the

as-applied challenge fails, we need not and do not address the facial challenge.  *See*

*Renne v. Geary*, 501 U.S. 312, 324 (1991) (endorsing the practice of (1) deciding an as-

applied challenge first, thus (2) obviating the need to address a facial challenge); *Colo.*

*Right to Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1155-56 (10th Cir. 2007).

Congress enacted the Federal Kidnapping Act in 1932 to outlaw interstate

kidnapping in response to the widely publicized abduction of aviator Charles Lindbergh's

son.  *See Chatwin v. United States*, 326 U.S. 455, 462-63 (1946).  A 2006 amendment

expanded the crime to include intrastate activity when an "offender . . . uses . . . any . . .

instrumentality of interstate . . . commerce in committing or in furtherance of the

---

[5] Mr. Sanford argues this issue in his opening brief.  Aplt. Sanford Br. at 1-24.
Mr. Ford devotes most of his opening brief to challenging the district court's jury
instructions regarding whether a cell phone, the Internet, and a GPS device are
instrumentalities of interstate commerce and whether kidnapping is a crime of violence.
But a few pages address the Commerce Clause issue, Aplt. Ford Br. at 28-32, and he
incorporates by reference his co-defendants' opening briefs, including Mr. Sanford's
Commerce Clause arguments, *id*. at 33.

Mr. Morgan, by contrast, did not raise this issue in his opening brief or at oral
argument.  In his reply brief, he attempts to adopt the Commerce Clause arguments
appearing in Mr. Sanford's brief.  Because Mr. Morgan raises this issue for the first time
in his reply brief, we address the issue only as to Mr. Sanford and Mr. Ford.  *See Hill v.*
*Kemp*, 478 F.3d 1236, 1250 (10th Cir. 2007) ("It is our general rule . . . that arguments
and issues presented at such a late stage are waived.").

offense." Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 616 (codified at 18 U.S.C. § 1201(a)(1)).

In accordance with this amended statute, each of the four kidnapping counts alleged the Defendants "use[d] a means, facility, and instrumentality of interstate and foreign commerce, those being cellular telephone(s), the internet[,] and a Global Positioning System, in committing and in furtherance of the commission of the offense." Ford ROA, Vol. I at 15-17.

The Defendants do not appeal the jury's determination that they used a cell phone, the Internet, or a GPS device to accomplish the abductions.[6] Instead, Mr. Sanford and Mr. Ford argue the indictment's reliance on their use of any of these devices violates the Commerce Clause because the charged criminal activity all occurred intrastate. We disagree based on Supreme Court precedent.

In *United States v. Lopez*, 514 U.S. 549 (1995), Chief Justice Rehnquist, writing for the majority, identified "three broad categories of activity that Congress may regulate under its commerce power": (1) "use of the channels of interstate commerce," (2) "the

---

[6] Mr. Sanford's argument he personally did not use an instrumentality is unavailing because he was a member of the conspiracy. *See Smith v. United States*, 133 S.Ct. 714, 721 (2013) (holding it is an "established proposition that a defendant's membership in the conspiracy, and his responsibility for its acts, endures even if he is entirely *inactive* after joining it.").

instrumentalities of interstate commerce," and (3) "activities having a substantial relation to interstate commerce." *Id*. at 558-59.

Based on the language of the federal kidnapping statute and the indictment, this case falls in the second category, which includes regulation aimed at local, in-state activity involving instrumentalities of commerce. *Lopez* cited the *Shreveport Rate Cases*, 234 U.S. 342 (1914), as an example. *See* 514 U.S. at 558. In *Shreveport*, the Court upheld Congress's authorizing the Interstate Commerce Commission to regulate intrastate rates charged by railroads providing interstate service. 234 U.S. at 351. *Lopez* also mentioned *Southern Railway Co. v. United States*, 222 U.S. 20 (1911), which upheld penalties under the Safety Appliance Act for operating defective railroad cars in intrastate traffic that were also part of interstate traffic. *Lopez*, 514 U.S. at 558.

Nowhere in *Lopez* or any other case has the Supreme Court limited Congress's regulatory authority to prevent the harmful use of an instrumentality of interstate commerce. Indeed, the *Lopez* Court said "Congress is empowered to regulate and protect the instrumentalities of interstate commerce . . . even though the threat may come only from intrastate activities." *Id.*[7]

---

[7] *See United States v. Ballinger*, 395 F.3d 1218, 1226 (11th Cir. 2005) ("Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature.")
Continued . . .

In the 2006 amendment to the Federal Kidnapping Act, Congress prohibited the use of instrumentalities of interstate commerce to commit the offense of kidnapping. The Supreme Court in *Shreveport* upheld a federal law that prohibited the use of an instrumentality of interstate commerce—a railroad—to charge discriminatory intrastate rail rates. *See Shreveport*, 234 U.S. at 351. Here we have a federal law that prohibits the use of an instrumentality to engage in kidnapping.[8] The indictment in this case charged and the evidence proved that Defendants used an instrumentality of interstate commerce to commit a kidnapping.

Federal prosecution for such conduct comports with the Commerce Clause. We conclude Mr. Sanford's and Mr. Ford's as-applied Commerce Clause challenge fails. As previously noted, we need not and do not address their facial challenge. *See Colo. Right to Life Comm.*, 498 F.3d at 1155-56.[9]

––––––––––––––––––––––––––––––––––––––––––

[8] The district court instructed the jury that cell phones, the Internet, and GPS tracking devices are instrumentalities of interstate commerce. Ford ROA, Vol. I at 1414. As discussed below, we affirm that instruction on plain error review.

[9] Although we are the first circuit court to address a constitutional challenge to the 2006 amendment, every district court to consider the issue has held 18 U.S.C. § 1201(a)(1) fits *Lopez*'s second category and is constitutional under Commerce Clause. *See United States v. Ramos*, No. 12 Cr. 556 (LTS), 2013 WL 1932110 (S.D.N.Y. May 8, 2013) (facial and as-applied challenges); *United States v. Taylor,* No. 12–0056-WS, 2012 WL 3522528 (S.D. Ala. Aug. 14, 2012) (facial challenge); *United States v. Jacques,* No. 2:08–cr–117, 2011 WL 1706765 (D. Vt. May 4, 2011) (facial and as-applied); *United*
Continued . . .

B. *Jury Instructions*

Mr. Ford challenges jury instructions 11 and 13 and argues the trial court plainly erred by not submitting to the jury two issues: (1) whether cell phones, GPS tracking devices, and the Internet are "instrumentalities of interstate commerce" and (2) whether kidnapping is a "crime of violence" under 18 U.S.C. § 924(c)(1), which imposes a sentence for the use of a firearm during the commission of such a crime.[10] He contends the jury should have been given the opportunity to determine these matters because they concern necessary elements the prosecution must prove. Keeping these questions from the jury, he says, violated his Sixth Amendment right to a fair jury trial. He cites *United States v. Keeling*, 235 F.3d 533, 537 (10th Cir. 2000) (holding that an element "must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict" (quotations omitted)). The Government argues these are questions of law for the judge to determine, not questions of fact for the jury to decide.

Because Mr. Ford did not object at trial to the jury instructions or propose alternate jury instructions, we review for plain error. *See United States v. Gonzalez-*

_____

*States v. Augustin,* No. 1:09–CR–187, 2010 WL 2639966 (E.D. Tenn. June 28, 2010) (facial); *United States v. Ochoa,* No. 8–CR–1980, 2009 WL 3878520 (D.N.M. Nov. 12, 2009) (as-applied, did not reach facial).

[10] Mr. Sanford and Mr. Morgan do not raise this issue.

-11-

*Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc).  Mr. Ford must show "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.*  We find no plain error and affirm.

1.  **Jury Instruction 11—Instrumentality of Interstate Commerce**

18 U.S.C. § 1201(a)(1) prohibits a person from using an "instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense [of kidnapping]."  Jury instruction 11—the instruction on counts 1, 2, 3, and 4 for kidnapping in violation of 18 U.S.C. § 1201(a)(1)—stated the jury must find that "the defendant whose case you are considering used or caused to be used an instrumentality of interstate commerce in committing or in furtherance of the kidnapping."  Ford ROA, Vol. I at 1413.  The instruction defined "[a]n 'instrumentality of interstate commerce' [to] include[] a cellphone, the internet[,] and a Global Positioning System 'GPS' tracker."  *Id.* at 1414.

We have decided the Internet is an instrumentality of interstate commerce.  *See Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008).  We have not, however, determined whether a cell phone or GPS

tracking device is an instrumentality of interstate commerce.[11]  In addition to the Internet,

the district court instructed the jury that cell phones and GPS tracking devices are

instrumentalities of interstate commerce.  Mr. Ford contends the jury must make those

determinations, not the court.  The question before us is whether the district court plainly

erred by not submitting these determinations to the jury.[12]

By giving instruction 11 to the jury, the district court concluded it must decide as a

matter of law whether cell phones, the Internet, and GPS devices are instrumentalities of

---

[11] We have held that telephones are instrumentalities of interstate commerce.  *See Kerbs v. Fall River Indus.*, 502 F.2d 731, 738 (10th Cir. 1974), *abrogated on other grounds by Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).  Other circuits have held that cell phones are instrumentalities.  *See, e.g.*, *United States v. Willoughby*, 724 F.3d 229, 240 (6th Cir. 2014); *United States v. Mandel*, 647 F.3d 710, 716 (7th Cir. 2011); *United States v. Evans,* 476 F.3d 1176, 1180 (11th Cir. 2007); *United States v. Giordano*, 442 F.3d 30, 40 (2d Cir. 2006); *United States v. Clayton,* 108 F.3d 1114, 1117 (9th Cir. 1997).  We said in an unpublished opinion that cell phones are instrumentalities.  *See United States v. Means*, 297 F. App'x 755, 759 n.5 (10th Cir. 2008) (unpublished) (citing *United States v. Evans*, 476 F.3d 1176, 1180 (11th Cir. 2007) for authority that cell phones are instrumentalities of interstate commerce).  But we have not done so in a published opinion, nor have we or any other circuit addressed GPS devices.

[12] Mr. Ford does not directly challenge the district court's determination that cell phones and GPS tracking devices are instrumentalities of interstate commerce, but his appeal would fail under the plain error standard of review even if he did.  "To be plain, an error must be clear or obvious under well-settled law." *United States v. Trujillo-Terrazas*, 405 F.3d 814, 818 (10th Cir. 2005) (quotations omitted).  As for cell phones, five other circuits have held they are instrumentalities of commerce, and we have done so in an unpublished opinion. *See supra* note 11.  No circuit has addressed GPS devices.  Under these circumstances, jury instruction 11 can hardly be considered plainly erroneous under well-settled law.

interstate commerce. The court's choice to decide this issue rather than asking the jury to do so was not plainly erroneous because there is no contrary Supreme Court or Tenth Circuit precedent and courts from other jurisdictions have decided similarly. *See United States v. Pierce*, 70 M.J. 391, 394 (C.A.A.F 2011) (determining whether the Internet is a facility or means of interstate commerce "is a question of law, to be answered by the . . . judge"); *see also United States v. Giordano*, 442 F.3d 30, 40 (2d Cir. 2006) (holding, as a matter of statutory interpretation, that intrastate telephone use constitutes the use of a facility or means of interstate commerce).

Mr. Ford argues that because the jury was required to determine whether Mr. Armendariz's young daughters were under 18 years of age for him to be convicted under 18 U.S.C. § 3559(f)(2) (increasing mandatory minimum sentence for kidnapping those under 18 years of age), the jury should also be required to find that cell phones, the Internet, and GPS devices are instrumentalities of interstate commerce as a matter of fact. This comparison is inapt. A victim's age is a question of fact under the circumstances of a given case.

When, as here, certain items have been deemed instrumentalities as a matter of law, the only fact question left for the jury is whether the Defendants used them. To hold otherwise would allow one jury, for example, to find that the Internet is an instrumentality of interstate commerce, and another jury to find in a substantially similar case that the Internet is not an instrumentality of interstate commerce. The district court

-14-

here correctly instructed the jury to determine whether the Defendants *used* an instrumentality of interstate commerce—a cell phone, the Internet, or a GPS device—in committing the crime. *See Pierce*, 70 M.J. at 394.

2. **Jury Instruction 13—Crime of Violence**

18 U.S.C. § 924(c)(1) prohibits the use or carrying of a firearm "during and in relation to any crime of violence or drug trafficking crime." Section 924(c)(3) defines "crime of violence" as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

In jury instruction 13—the instruction on count 6 for using a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)—the district court instructed that to convict, the jury must find "the defendant whose case you are considering committed the crime of kidnapping or conspiracy to kidnap, which are crimes of violence." Ford ROA, Vol. I at 1418.

Whether a crime fits the § 924(c) definition of a "crime of violence" is a question of law. *See United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005) (calling the district court's determination of whether a crime is a crime of violence under § 924(c) a "legal conclusion"). The answer requires examination of the legal elements of the crime, not an exploration of the underlying facts. *See Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004)

-15-

(holding that whether a crime is a crime of violence under 18 U.S.C. § 16—which uses nearly identical language to § 924(c)(3)—"requires us to look to the elements and the nature of the offense of conviction, rather than the particular facts relating to [the Defendants'] crime"). Accordingly, whether kidnapping is a crime of violence turns not on whether the Defendants committed violent acts, but whether the offense itself is a crime of violence.

The Supreme Court has recognized kidnapping as a crime of violence under 18 U.S.C. § 924(c). *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999). The United States Sentencing Commission Guidelines Manual also lists kidnapping as a crime of violence. U.S. Sentencing Guidelines Manual § 4B1.2(a) & cmt. n.1 (2013) (defining "crime of violence" using similar language to § 924(c)(3)).

We have held that conspiracy to commit a federal crime of violence also is a § 924(c) crime of violence. *See United States v. Brown*, 200 F.3d 700, 705-06 (10th Cir. 1999) (holding that a conspiracy to carjack is a crime of violence under § 924(c) because "an agreement to accomplish the statutory elements of carjacking necessarily involves a substantial risk of physical force"); *see also United States v. Patino*, 962 F.2d 263, 267 (2d Cir.1992).

Because kidnapping and conspiracy to kidnap are crimes of violence as a matter of law, the district court was correct in not submitting this question to the jury. *See Sparf v. United States*, 156 U.S. 51, 64-65 (1895).

## C. *Statements of Co-Conspirators*

All three Defendants argue the district court erred in admitting, under Federal Rule of Evidence 801(d)(2)(E), an intercepted phone call during which Mr. Patterson, Mr. Tabor, Mr. Ford, and Mr. Morgan (though only briefly) spoke about dividing the proceeds of the crime. They contend the statements were not made in the course of or in furtherance of the conspiracy. They also contend admitting the statements violated their Sixth Amendment right to confront their accusers under *Bruton v. United States*, 391 U.S. 123 (1968).[13]

The phone call at issue[14] started at 3:19 a.m. on September 23, 2009, a few hours after the kidnapping and robbery, and lasted 42 minutes. Before the call, several of the co-conspirators—Defendants Ford, Sanford, and Morgan—had already met to share the proceeds. On the call, Mr. Ford complained that Mr. Morgan had taken more than his

---

[13] At the district court, all three defendants objected on Rule 801(d)(2)(E) and Sixth Amendment grounds. Both Mr. Sanford and Mr. Morgan argue in their opening briefs the phone call's admission violated Rule 801(d)(2)(E) and the Sixth Amendment. But Mr. Ford did not raise this question in his opening brief. Instead, he attempted to join the entirety of the other Defendants' briefs without explaining how the arguments apply to him. Generally, "[t]his is problematic because it requires the court to sift through the briefing and record and imagine which arguments might apply to which Defendants." *United States v. Renteria*, 720 F.3d 1245, 1251 (10th Cir. 2013). In this instance, however, because Mr. Sanford's and Mr. Morgan's arguments can apply to Mr. Ford, we consider this issue as to him.

[14] The recorded phone call was admitted as Exhibit 14A. A transcript of this conversation was admitted as Exhibit 14B.

-17-

share.  Mr. Morgan then joined the call and stated he would come to Mr. Tabor's house in the morning.  A short time later, Mr. Morgan arrived at Mr. Tabor's house, and the co-conspirators finished dividing up the proceeds.

The Defendants filed pretrial motions in limine to exclude this intercepted phone call based on both Rule 801(d)(2)(E) and the Sixth Amendment.  The district court denied the motion based on Rule 801(d)(2)(E), subject to the Government proving the foundational predicates before admitting the phone call.  The Defendants again unsuccessfully objected on both grounds just before jury selection.  The district court said the statements were made in the course of and in furtherance of the conspiracy, thereby satisfying Rule 801(d)(2)(E), and admitting them would not violate the Sixth Amendment because the statements were not testimonial.  When the Government sought to admit the call in its case-in-chief, Defendants renewed their Rule 801(d)(2)(E) objection, which the district court overruled.

The Defendants argue on appeal the district court's admission of the phone call violated Rule 801(d)(2)(E) and the Sixth Amendment.  As explained below, we review the issue raised under Rule 801(d)(2)(E) for clear error and abuse of discretion, and the Sixth Amendment issue de novo.

1. **Rule 801(d)(2)(E)**

Under Rule 801(d)(2)(E), co-conspirators' statements that would otherwise be hearsay may be introduced as evidence against a defendant co-conspirator if they were

made "during and in furtherance of the conspiracy." Before admitting such evidence, the court must determine "(1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). The Defendants contest the third element.

"[W]hile the ultimate issue of the admission or exclusion of evidence is reviewed for an abuse of discretion, preliminary foundational determinations, such as whether statements offered under Rule 801(d)(2)(E) were made [in] the course of and in furtherance of a conspiracy, are factual findings, reviewed for clear error." *United States v. Williamson*, 53 F.3d 1500, 1517 (10th Cir. 1995) (quotations omitted). Clear error review "ask[s] whether, on the entire evidence, [the court] is left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quotations omitted).

We conclude that the district court's factual determination that the call was made in the course of and in furtherance of the conspiracy was not clearly erroneous, and that admission of the phone call under Rule 801(d)(2)(E) was not an abuse of discretion.

A conspiracy continues until its central purpose has been attained. *See Grunewald v. United States*, 353 U.S. 391, 401-02 (1957) (rejecting an implied subsidiary conspiracy to conceal the crimes because the original purpose had been accomplished); *Krulewitch v.*

-19-

*United States*, 336 U.S. 440, 442-43 (1949) (same). "To determine the scope of the alleged conspiratorial agreement, the court is bound by the language of the indictment." *United States v. Qayyum*, 451 F.3d 1214, 1218 (10th Cir. 2006) (quotations omitted).

As evident from the call and other evidence, the central purpose of kidnapping and robbing Mr. Armendariz was to obtain money and divide it among the co-conspirators. The co-conspirators on the call discussed concerns about an unfair distribution of the proceeds, which furthered their purpose to kidnap for money. After the call, the co-conspirators met again to redistribute proceeds.

"It is well settled that the distribution of the proceeds of a conspiracy is an act occurring during the pendency of the conspiracy." *United States v. Davis*, 766 F.2d 1452, 1458 (10th Cir. 1985); *see also United States v. Knowles*, 66 F.3d 1146, 1156-57 (11th Cir. 1995) (distribution of proceeds is in furtherance of conspiracy); *United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir. 1989) (admitting under Rule 801(d)(2)(E) conversations of co-conspirators about how proceeds of theft would be distributed); *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978) ("[I]t is fair to say that where a general objective of the conspirators is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants.").[15]

---

[15] The Defendants argue the district court erred in how it applied *United States v. Dynalectric, Co.*, 859 F.2d 1559 (11th Cir. 1988). *Dynalectric* was a bid-rigging case
Continued . . .

The indictment lists the Defendants' multiple meetings to divide the proceeds—which would include the meeting at Mr. Tabor's house following the phone call—as one of the 21 overt acts in furtherance of the conspiracy. Ford ROA, Vol. I at 21. Based on the record, we cannot hold the district court clearly erred in finding the call was made in the course of and in furtherance of the conspiracy.[16]

_____

holding that the conspiracy continued until all the proceeds were procured and distributed. *Id.* at 1563. The Defendants argue their case is distinguishable because, unlike in *Dynalectric*, the conspiracy to kidnap here did not involve a plan for future receipt of monies over time. But *Dynalectric* can reasonably stand for the proposition that the conspiracy does not end until all the money has been distributed, which is consistent with this case. Apart from *Dynalectric*, our own precedent is controlling. *See Davis*, 766 F.2d at 1458.

[16] The Defendants also argue the phone call is inadmissible because it is a mere narrative of past events. They cite *United States v. Roberts*, 14 F.3d 502, 514-15 (10th Cir. 1993) ("In general, mere narratives between coconspirators or narrative declarations of past events are not 'in furtherance,' while statements of future intent that set transactions integral to the conspiracy in motion and maintain the information flow among coconspirators meet the 'in furtherance' requirement.").
This argument fails for the same reasons we conclude the phone call was made in furtherance of the conspiracy. Although part of the call recounted past events, the purpose of the call was to discuss future actions, including Mr. Morgan's suggestion to meet again. Indeed, *Roberts* works against them: "Statements made to induce enlistment or further participation in the group's activities, to prompt further action on the part of conspirators, to reassure members of a conspiracy's continued existence, to allay a coconspirator's fears, or to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance of' requirement." *Id.* at 515 (quotations omitted).

The Defendants also argue Mr. Morgan withdrew from the conspiracy before the phone call, so the call could not have been in the course of the conspiracy. But the record indicates otherwise.

The defendant has the burden to show withdrawal by proving he or she "attempt[ed] to undo the wrong that has been done in one of two ways": (1) "give authorities information with sufficient particularity to enable the authorities to take some action to end the conspiracy"; or (2) "communicate his [or her] withdrawal directly to his [or her] coconspirators in a manner that reasonably and effectively notifies the conspirators that he [or she] will no longer be included in the conspiracy." *United States v. Randall*, 661 F.3d 1291, 1294-95 (2011). The second method "requires more than implied dissociation. It must be sufficiently clear and delivered to those with authority in the conspiracy such that a jury could conclude that it was reasonably calculated to make the dissociation known to the organization." *Id.*

The district court did not clearly err in finding Mr. Morgan had not withdrawn from the conspiracy. The record shows Mr. Morgan had not withdrawn or frustrated the purpose of the conspiracy at the time of the phone call. Although Mr. Morgan left the crime scene with the money, he met with his co-conspirators to divide the proceeds, he joined the phone call about the proceeds to say he was coming to Mr. Tabor's house, and he then redistributed the proceeds. Rather than showing withdrawal, these actions demonstrate his continued participation in the conspiracy.

-22-

## 2. **Sixth Amendment *Bruton* Claim**

The Defendants contend the admitted phone call violated their Sixth Amendment right to confront their accusers under *Bruton*. *See Bruton*, 391 U.S. at 124-26. We review de novo any alleged Sixth Amendment *Bruton* errors. *See United States v. Nash*, 482 F.3d 1209, 1218 (10th Cir. 2007).

*Bruton* holds that admission of a non-testifying co-defendant's confession implicating another defendant violates the latter's Sixth Amendment Confrontation Clause protection because it deprives the right to cross-examine the declarant. *See* 391 U.S. at 124-26. A jury instruction to consider the statement only against the declarant and not any co-defendant is not sufficient to cure a *Bruton* error. *See United States v. Hill*, 901 F.2d 880, 883 (10th Cir. 1990).

The Defendants' claim fails because *Bruton* applies only to testimonial statements. *See United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010). A testimonial statement is a "formal declaration made by the declarant that, when objectively considered, indicates" that the "primary purpose of the [statement is] to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 777-78 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)).

In overruling the Defendants' Confrontation Clause objection to Exhibit 14A, the district court said "the Sixth Amendment applies only to statements that are testimonial"

-23-

and "[t]here is absolutely no indication that the statements in the telephone call" are testimonial.  Ford ROA, Vol. II at 42.  We agree.

The statements in the contested phone call were not made to be used for investigation or prosecution of a crime.  *See Smalls*, 605 F.3d at 777.  The parties on the call were speaking on a private phone line to co-conspirators.  No law enforcement official or any other third party participated in the conversation.[17]  Mr. Ford recounted events from the crime to his fellow conspirators, who in turn made inculpatory statements during the call.  No one referenced any pending or future prosecution.  The record does not support a conclusion that the primary purpose of the statements in the phone call was to "establish or prove past events potentially relevant to later criminal prosecution."  *Id.*  The statements, in short, were not testimonial.

Because *Bruton* does not apply to non-testimonial statements, *see id.* at 768 n.2, the district court did not violate the Defendants' Sixth Amendment rights by admitting the phone call into evidence.

---

[17] Although law enforcement wiretapped the phone call, there is no evidence the Defendants knew of the wiretap.  *See United States v. Ramirez*, 479 F.3d 1229, 1249 (10th Cir. 2007) (holding statements of co-conspirators procured through a wiretap are not testimonial because they were made in furtherance of a conspiracy) *abrogated on other grounds as recognized in United States v. Bagby*, 696 F.3d 1074, 1081 (10th Cir. 2012); *see also United States v. Crawford*, 541 U.S. 36, 56 (2004) (holding that "statements in furtherance of a conspiracy" are by nature not testimonial).

-24-

### D. *Rule 404(b) Evidence and Mistrial*

Mr. Morgan argues the district court erred by failing to order a mistrial after the jury heard evidence of Mr. Morgan's prior bad acts in the same phone call discussed above.[18] As noted below, even if Mr. Morgan preserved this issue for appeal, we affirm under the abuse of discretion standard of review.

At a pretrial motions hearing, Mr. Morgan objected to the phone call's admission under Rule 404(b).[19] The district court did not rule at that time. As noted above, all Defendants objected at trial to admission of the phone call. After the phone call was admitted, Mr. Morgan complained the call included two statements that should have been excluded under Rule 404(b) because they implicated him in prior criminal activity.[20] Mr.

---

[18] Mr. Ford attempts to join this issue as part of the blanket statement in his brief joining the other briefs. He did not make this objection in the district court and provides no argument as to how this evidence affects him. We do not consider this issue as to Mr. Ford. *See Renteria*, 720 F.3d at 1251. Mr. Sanford does not attempt to join this issue.

[19] Rule 404(b)(1) prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

[20] The first reference was Mr. Ford's statement about a prior dealing with Mr. Morgan:

> That's just like when we had got Cortino. You know what I'm saying? The n[word] was supposed to come back in with ten. This n[word] don't come back at all. He done went from California to Dallas to Atlanta to New York. Then he comes back three weeks later with $200 n[word]. Continued . . .

Morgan's counsel said he did not "know how that can be cured by any type of limiting instruction at this time." Ford ROA, Vol. II. at 685. The court agreed that admitting the statements violated Rule 404(b), ordered the statements stricken from the record, and instructed the jury not to consider them.[21] Mr. Morgan did not object to these curative measures.

Mr. Morgan's failure to ask explicitly for a mistrial before or after the district court acted on the Rule 404(b) concern suggests he forfeited this issue. Assuming without deciding he raised the mistrial issue when he said no limiting instruction could cure the Rule 404(b) problem, the district court did not abuse its discretion by not ordering a mistrial. *See United States v. Peveto*, 881 F.2d 844, 859 (10th Cir. 1989) (we review the district court's denial of a mistrial motion for abuse of discretion).

_____

Ford ROA, Vol. II at 681-82. Mr. Morgan's counsel explained that Mr. Ford was referencing a crime Mr. Morgan allegedly committed for which Mr. Morgan was paid $10,000 but only returned with $200 to share. *Id.*

The second reference was from Mr. Patterson. Mr. Morgan's counsel explained Mr. Patterson was talking about when Mr. Morgan committed a crime with others and split the proceeds right away. Mr. Patterson stated, "Check this out though, Cave [Mr. Ford]. Check this out though, Cave. I'm just saying, okay. You all had a shootout and some more shit the other time and you all shot straight over here. That was the whole lot going on right there." *Id.* at 682-83.

[21] Because the district court decided the evidence was inadmissible, Mr. Morgan only challenges the district court's not declaring a mistrial.

"Where [admitted] evidence is later ruled inadmissible, a cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error." *Id.* "However, as an exception to the general rule, where the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered." *Maestas v. United States*, 341 F.2d 493, 496 (10th Cir. 1965).

Here, the district court gave the jury a cautionary instruction and redacted the challenged statements.[22] Mr. Morgan failed to show before the district court and now on appeal why this evidence was so prejudicial that the curative jury instruction was not sufficient. The statements were street slang, vague, and a small fraction of a 42-minute audio conversation. They were therefore difficult to understand.

In the first statement, Mr. Ford recalled the time they "got Cortino" and "the n[word] was supposed to come back in with ten." Ford ROA, Vol. II at 681-82. It is not clear to whom Mr. Ford is referring, who or what Cortino is, or what "got" means.

---

[22] The district court told the jury the remarks about prior acts had been stricken and the jury "may not consider or use this stricken material as evidence or for any other purpose during the trial. And the written transcript will be redacted to exclude any reference to this stricken material." Ford ROA, Vol. II at 714.

The second statement by Mr. Patterson is virtually incomprehensible: "You all had a shootout and some more shit the other time and you all shot straight over here. That was the whole lot going on right there." *Id.* at 682-83. It is not clear who "you all" refers to, or what the "shootout" or "some more shit the other time" was, or what "shot straight over here" means.

Mr. Morgan relies on *Maestas*, where we reversed the denial of a mistrial when at trial the objectionable statement was made a second time after the court warned the witness not to say it. *See* 341 F.2d at 496. Here, the tape was played once for the jury. Although the jury had an unredacted transcript at the time the call was played, the transcript the jury had in deliberations was redacted, and the district court instructed the jury to not consider the stricken statements. No witnesses were questioned about those statements, and the Government did not use them in closing argument. Unlike *Maestas*, this is not a case where the statements created so "strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case." *Id.*

Even if Mr. Morgan preserved his mistrial issue for appeal, the district court did not abuse its discretion in failing to order a mistrial.

## E. *Ms. Flores's Identification Testimony*

Mr. Sanford and Mr. Morgan argue the district court erred by denying a mistrial based on Ms. Flores's testimony.[23] Until Ms. Flores testified, she had not been able to identify any of the perpetrators. The Defendants expected she would not be asked to do so at trial. On cross-examination by Mr. Morgan's counsel, Ms. Flores confirmed she had excluded a photo of Mr. Morgan from a photo array. Ford ROA, Vol. II at 164-72. After this cross-examination, Ms. Flores appeared emotional and the court took a recess. Mr. Sanford's counsel then cross-examined Ms. Flores.

On redirect, the Government asked:

Q: Ms. Flores, I know you've gotten upset a few times. Do you recognize any of the men who were at your house in the courtroom today?
A: Yes.

Ford ROA, Vol. II at 187.

All three Defendants immediately objected to this questioning as beyond the scope of cross-examination. The district court dismissed the jury, and all three defense counsel continued to argue that none of them had asked Ms. Flores to identify the Defendants,

---

[23] Mr. Morgan and Mr. Sanford argue this issue in their opening briefs. Mr. Ford attempts to join this issue as part of his blanket statement in his brief joining the other briefs, but he does not make any argument on appeal about why he was prejudiced. Mr. Sanford and Mr. Morgan each argue this testimony specifically prejudiced each of them in unique ways. Their arguments do not apply to Mr. Ford. He did not present any arguments as to why Ms. Flores's identifying statement prejudiced him specifically. We therefore do not consider this issue as to him. *See Renteria*, 720 F.3d at 1251.

and that the Government's question broached an entirely new topic in a manner that was unduly prejudicial. The Defendants also argued Ms. Flores's identification testimony was improper because the Government had not provided them during discovery any indication Ms. Flores could identify a defendant. Mr. Sanford then moved for mistrial. The Government moved to withdraw the question.

The district court next heard argument on Mr. Sanford's motion for mistrial, which the other defendants joined. The district court denied the motion because a cautionary instruction would ameliorate any prejudice. The court said it could better evaluate prejudice at the end of the Government's case-in-chief. The court instructed the jury to disregard the question and Ms. Flores's answer and not consider them as evidence:

> [You are instructed t]hat the last question yesterday afternoon by [the Government] and the answer of Ms. Flores to that last question have been stricken by the Court. Thus, this question and answer are not evidence in this trial and may not be used as such by you, the jury.
>
> I rehearse or reiterate that any verdict you return must be based on the evidence presented properly during the trial and may not be based on anything that I have stricken, which must be disregarded entirely.

Ford ROA, Vol. II at 225.

We review the district court's denial of the mistrial motion for abuse of discretion. *See Peveto*, 881 F.2d at 859. We reverse only if we have a "definite and firm conviction that the lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chanthadara*, 230 F.3d 1237, 1248 (10th Cir. 2000) (quotations omitted).

-30-

"[A] cautionary instruction is ordinarily sufficient to cure any alleged prejudice to the defendant and declaring a mistrial is only appropriate where a cautionary instruction is unlikely to cure the prejudicial effect of an error." *Peveto*, 881 F.2d at 859. We look to see if the evidence "will create so strong an impression" on the jurors that they could not "disregard it in their consideration of the case" despite cautionary instructions. *Maestas*, 341 F.2d at 496. "[M]otions for mistrial . . . call for an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996).

Based on our review of the record, we do not think Ms. Flores's uncompleted identification testimony was so prejudicial that the district court abused its discretion by denying the motion for mistrial and opting instead for a curative instruction. Ms. Flores's testimony was one short moment in a seven-day trial. Again, unlike in *Maestas*, the question here was posed only once. She did not identify anyone. The district court advised the jury to disregard the statement, and juries are presumed to follow curative instructions. *See United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005).

Mr. Sanford argues this evidence prejudiced him because his main defense was that he did not commit any crime and therefore could not be identified as one of the perpetrators. He further argues that Ms. Flores's statement that she could identify a perpetrator undermined his defense because the jury could speculate Ms. Flores saw Mr. Sanford. These arguments fail because there was ample evidence placing him as a

-31-

perpetrator at the scene.  Mr. Tabor testified that Mr. Sanford was part of the conspiracy, and the wiretap recorded a phone call in which Mr. Ford discussed Mr. Sanford's role in the crime.  The police officer's son, from whom Mr. Sanford procured the police gear, also identified Mr. Sanford.  In the face of this evidence, Mr. Sanford fails to show how the uncompleted identification was so prejudicial as to necessitate a mistrial.

Like Mr. Sanford, Mr. Morgan argues prejudice because the jurors would believe that Ms. Flores could identify one of the Defendants but were left to speculate which one.[24]  He also contends the only other evidence linking him to the crime was the biased testimony of the unindicted co-conspirators, Mr. Patterson and Mr. Tabor.  These arguments also fail because the evidence against Mr. Morgan was overwhelming.  Mr. Tabor and Mr. Patterson testified about Mr. Morgan's involvement.  Mr. Ford spoke on the phone call about Mr. Morgan's involvement, and Mr. Morgan's participation in the phone call bolsters that conclusion.

---

[24] Mr. Morgan asserts this problem was compounded by a recorded phone call played for the jury in which Mr. Ford stated that Ms. Flores saw Mr. Sanford's and Mr. Morgan's faces.  Upon hearing this statement later in the trial, Mr. Morgan argues, the jury would be reminded of Ms. Flores's uncompleted identification and speculate as to which of these two men Ms. Flores had intended to identify in court.

Mr. Morgan did not make this argument in the district court.  Because we do not review issues for the first time on appeal, Mr. Morgan has waived this argument.  *See United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002).

Furthermore, any prejudice was ameliorated because Mr. Morgan's counsel extensively cross-examined Ms. Flores about her previous attempts to identify Mr. Morgan and established she had at one point ruled him out as one of the perpetrators. Although the question may have invited the jury to speculate, Ms. Flores had not identified Mr. Morgan at any time up to and after that point in trial.

Ms. Flores's uncompleted identification did not impair Mr. Sanford's or Mr. Morgan's right to a fair trial or warrant the "drastic action of declaring a mistrial." *Gabaldon*, 91 F.3d at 95 (quotations omitted). The district court's refusal to declare a mistrial was not an abuse of discretion.

## F. *Severance*

Mr. Sanford appeals the district court's denial of his severance motion.[25] All three Defendants were indicted together and slated for a joint trial. Before trial, Mr. Sanford moved to sever, and the district court denied his motion. Mr. Sanford renewed his motion after Ms. Flores stated she could identify one of the perpetrators. The district court denied Mr. Sanford's motion again. Mr. Sanford argues the district court abused its

---

[25] We address this issue only as to Mr. Sanford. Mr. Ford also moved for severance at the district court, and he now attempts to join this issue as part of his blanket statement joining the other briefs. He does not provide any arguments on appeal as to why the denial of his severance motion prejudiced him. Mr. Sanford's arguments are specifically about why the joint trial prejudiced him because he was less involved than the other defendants. These arguments do not apply to Mr. Ford, and we do not consider this issue as to him. *See Renteria*, 720 F.3d at 1251.

discretion as to both rulings because he suffered prejudice from being tried with the other Defendants, against whom the evidence was much stronger.

"We review the district court's denial of a motion to sever for an abuse of discretion." *United States v. Hall*, 473 F.3d 1295, 1302 (10th Cir. 2007).

Federal Rule of Criminal Procedure 14(a) states: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." The Supreme Court has expressed a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States,* 506 U.S. 534, 537 (1993). "[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* "Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case." *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984).

To establish "real prejudice, the defendant must demonstrate that the alleged prejudice he suffered outweighed the expense and inconvenience of separate trials." *United States v. Martin,* 18 F.3d 1515, 1518 (10th Cir. 1994) (quotations omitted). The

requisite showing of prejudice "is not made by a complaint that one defendant is less culpable than another, or by an allegation that a defendant would have a better chance of acquittal in a separate trial, or by a complaint of the 'spill-over' effect of damaging evidence presented against a codefendant." *United States v. Iiland*, 254 F.3d 1264, 1270 (10th Cir. 2001) (citations omitted). "Rather, a defendant must show that he was deprived of his right to a fair trial." *United States v. Zapata*, 546 F.3d 1179, 1191 (10th Cir. 2008).

Mr. Sanford failed to meet his heavy burden both before the district court and now on appeal. Although some elements of the Government's case implicated only the other defendants, Mr. Sanford had the opportunity to point this out to the jury through cross-examination and again during closing argument. The jury was instructed to examine the evidence for each individual defendant, and juries are presumed to follow instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Mr. Sanford asserts only that the spill-over effect of damaging evidence about the other defendants prejudiced him. This assertion is not sufficient to support the requisite showing of prejudice. *See Iiland*, 254 F.3d at 1270.

We conclude the district court did not abuse its discretion by denying Mr. Sanford's motion for severance.

## G. *Cumulative Error*

Mr. Morgan argues we should reverse because all the errors combined deprived him of his right to a fair trial. "To analyze cumulative error, we aggregate all the errors that we have found to be harmless and determine whether their cumulative effect on the outcome of the trial mandates reversal." *United States v. Anaya*, 727 F.3d 1043, 1060-61 (10th Cir. 2013) (quotations omitted). This "applies only if true errors occurred." *Id.* at 1061. We deny Mr. Morgan's cumulative error appeal because we find no error among the appealed issues.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court.

12-1408, 12-1442, 13-1032; *United States v. Morgan, et al.*

**HOLMES,** Circuit Judge, concurring.

I respectfully concur. I agree with the outcome of the majority's opinion and, with one exception, endorse its reasoning. The exception involves Part II.D. In particular, I write separately to express my view that Mr. Morgan forfeited his claim that the district court should have declared a mistrial after the jury heard potentially improper Rule 404(b) evidence. Thus, rather than affirming under the abuse-of-discretion standard, I would review this claim for plain error and affirm under that rubric.

The majority correctly notes that we *generally* review the refusal to grant a mistrial for an abuse of discretion. *See United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005). But we do so only when the mistrial decision is "squarely presented" to the district court. *United States v. Taylor*, 514 F.3d 1092, 1096 (10th Cir. 2008). As I read our precedent, there can *be* no abuse of discretion in this regard if the defendant never requested a mistrial. *See United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001) ("Where there has been no motion for a mistrial . . . , the district court has not exercised its discretion, and therefore it is meaningless to look for an abuse of discretion." (quoting *United States v. Gabaldon*, 91 F.3d 91, 94 (1996)) (internal quotation marks omitted)). The record indicates that Mr. Morgan never gave the district court an opportunity to exercise its discretion by seeking a mistrial on the alleged 404(b) issue.

Nonetheless, Mr. Morgan contends that "[he] *implied* that there was a

motion for a mistrial," Oral Argument at 14:55, *United States v. Morgan* (No. 12-1408), and the majority seems willing to entertain this possibility. *See* Majority Op. at 25–26 (noting that Mr. Morgan failed to "ask explicitly for a mistrial before or after the district court acted" but "[a]ssuming without deciding he raised the mistrial issue when he said no limiting instruction could cure the Rule 404(b) problem"). However, I believe the more prudent course is *not* to countenance, even tacitly, "implied-mistrial" arguments, lest in so doing, we suggest that district courts should act as advocates for defendants—obliged to apprehend and respond to such implied arguments. That would be error, for "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005).

In my opinion, our precedent makes clear that (1) mounting a vague objection to the evidence in question does not "squarely present" a mistrial request; and (2) in this case, Mr. Morgan forfeited his 404(b)-mistrial challenge in prototypical fashion and, accordingly, he is entitled to no more than plain-error review. *See United States v. Anaya*, 727 F.3d 1043, 1059 (10th Cir. 2013) ("[The defendant] did not request a mistrial. We therefore review the district court's failure to grant a mistrial sua sponte . . . for plain error . . . [and conclude that] the district court was not clearly obligated to grant a mistrial sua sponte."); *Taylor*, 514 F.3d at 1096 (applying plain-error review when the defendant "did

2

not [expressly] move for a mistrial and the court rapidly responded with a curative instruction"); *id.* at 1100 (finding "no authority for the proposition that the district court was clearly obliged . . . to grant a mistrial *sua sponte*"); *United States v. Devous*, 764 F.2d 1349, 1356 (10th Cir. 1985) ("The court sustained the defense's objection [to an alleged error]. [The defendant] now contends that . . . the court should have granted a mistrial *sua sponte*. We disagree."); *United States v. Crawford*, 707 F.2d 447, 450 (10th Cir. 1983) ("[I]n the absence of a motion for mistrial, we must weigh the prejudicial effect of the [error] with the weight of the evidence pointing to . . . guilt.").

Under the plain-error standard, even assuming *arguendo* that the court's alleged error on this score was "clear or obvious under current law," *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007) (internal quotation marks omitted), I would affirm the district court's judgment because any error did not impact Mr. Morgan's substantial rights. Mr. Morgan has not argued that, but for the district court's inaction, an acquittal was likely—and, given the copious evidence supporting the verdict (as noted by the majority, *supra*), I am confident that he could not have made such a showing. Mr. Morgan also benefitted from rigorous cross-examination of witnesses *and* two limiting instructions regarding the Rule 404(b) evidence, which would belie any suggestion that his substantial rights were affected. In other words, I would conclude that his claim fails under the third prong of our plain-error test.

3

In sum, I fully join in the panel's ultimate decision to affirm. However, regarding Part II.D—addressing the 404(b)-mistrial challenge—I would affirm on different grounds, concluding that Mr. Morgan forfeited this challenge and has not satisfied the plain-error standard.